[No. F009724. Fifth Dist. May 10, 1988.]

THE PEOPLE ex rel. JOHN K. VAN DE KAMP, as Attorney General, etc., Plaintiff and Respondent, v.
CAPPUCCIO, INC., et al., Defendants and Appellants.

**COUNSEL**

Noland, Hamerly, Etienne & Hoss, Myron E. Etienne, Jr., and Ralph P. Guenther for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Robert H. Connett, Assistant Attorney General, and Bruce S. Klafter, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**WOOLPERT, Acting P. J.**—In a complaint filed in Monterey County Superior Court, defendants Frank and Santo Cappuccio, Cappuccio, Inc. (dba U. S. Freezer Co.), Rosaria Cappuccio, and Does I through X, were alleged to have committed unlawful business practices by understating the weight of squid purchased from fishermen, in violation of Fish and Game Code section 8011. It was also alleged that the understating of the weight resulted in defendants' not paying the full tax due under Fish and Game Code section 8045. The failure to use the correct weight figures was further alleged to have violated Business and Professions Code[1] section 12512, which precludes a purchaser from buying any commodity according to a quantity which is less than the true quantity when the equipment used to measure the quantity is supplied by the purchaser.

The prayer in the complaint asked for a permanent injunction requiring defendants to properly prepare receipts as required by Fish and Game Code section 8011; to pay the full privilege tax pursuant to Fish and Game Code section 8045; to purchase fish from fishermen by representing that the quantity purchased is the true quantity, rather than something less than the true quantity; to pay a civil penalty of $2,500 for each violation of Business and Professions Code section 17200. The prayer also requested the court appoint a receiver to prevent defendants from any unlawful business practice, and to restore to any person any money which defendants may have acquired by their unlawful business practice. Costs were requested as well.

---

[1] All statutory references are to the Business and Professions Code unless otherwise indicated.

Defendants filed a general denial and claimed the bringing of the action constituted selective enforcement of the Fish and Game Code in violation of defendants' right of equal protection. The Attorney General's office was substituted as attorney for the People.

A court trial followed, with judgment entered in favor of the People and against defendants. The court found the defendants engaged in a consistent practice of underweighing squid purchased from fishing boats. The court found 592 violations of Fish and Game Code section 8011 and Business and Professions Code sections 12512 and 17200. A penalty of $73,528.05 was imposed pursuant to section 17206. The total figure was arrived at after the court calculated defendants failed to report the purchase of squid totaling $60,641.75; avoided taxes in an amount of $886.30; and that plaintiff (the People) incurred $12,000 in investigative costs. Defendants timely appeal from the judgment.

## FACTS

U. S. Freezer is owned and operated by defendants, who are in the business of purchasing squid and herring from commercial fishing boats. The catch purchased is then packaged, frozen, and sold wholesale. The business is located on a wharf in Monterey. Defendants have been in the business for over 35 years.

Generally, fishing boats arrive early in the morning and dock at the wharf. The squid contained in the holds are pumped out onto a conveyer belt running into the U. S. Freezer building. Along with the squid, what is termed "trash" fish (fish other than squid) and incidental matter (such as seaweed) are also sucked out of the holds.

The conveyer belt is made of metal and has holes in it which allows water sucked from the hold to drain away. The conveyer belt empties into a hopper, which when opened, dumps its contents into a weight bucket or bin. The hopper is closed when the scale for the weight bin shows the bin contains approximately 500 pounds of material. After being weighed, the material then passes to another conveyer belt after the weighing bin is opened. This second conveyer belt carries the catch to an awaiting truck. The truck transports the catch to a processing plant.

The conveyer belts run continuously during the weighing process. Two levers are involved. One lever controls a gate at the top of the weighing bin and allows the squid to drop into it. The other lever opens the bottom of the weighing bin and allows the catch to fall onto the second conveyer belt. Defendant Santo Cappuccio acted as the weighmaster for the business, and generally operated both levers and recorded the weights.

At the processing plant, the squid are put through what is termed the bleaching process. Because they arrive dark gray, or even blackish in color, the squid are chilled with ice and cold water, which work to turn the squid to a whiter color. The squid increase in weight in direct proportion to the length of time they are exposed to the bleaching process.

In June of 1979, John Ewald, an assistant fish and game warden, was assigned to monitor the squid weighing operations at the Monterey wharf. The assignment resulted from complaints received by the department regarding weighing practices of fish processors. Ewald's investigation focused upon the accuracy and completeness of the weight slips which are filled out as the squid are unloaded and weighed. The receipts are then turned in to the department pursuant to state law. Defendants' operation was one of the six buyers Ewald observed.

According to Ewald, defendants (1) left the bottom and top of the weighing bin open, which allowed squid to pass through unweighed; (2) recorded bin weights by making hash marks on a piece of paper near the scale, with each hash mark representing 500 pounds despite the fact the scale actually registered as much as 580 pounds; (3) reduced the amount of squid in the weigh bin to a figure closer to 500 pounds upon discovering Ewald's presence. On at least four occasions in 1979, Ewald made scale readings which showed weights in excess of 550 to 580 pounds that were being recorded as 500 pound hash marks.

Two of defendants' trucks which were fully loaded with squid previously weighed at the wharf were directed to a public truck scale by a special investigator with the Division of Weights and Measures Standards. The investigator was looking into a complaint by the sealer of weights and measures in Monterey County.

The squid were observed being loaded into the trucks prior to the trucks being directed to the scales. After the weight of the emptied trucks was subtracted from the gross weight, the net weight of the squid inside the trucks was compared with the weight slips turned in to the Department of Fish and Game. These slips, as previously noted, purportedly reported the weight of the squid as it came out of the fishing boats prior to being loaded into the trucks.

For the first truck, the receipts showed 45,170 pounds of squid, whereas 48,080 pounds were found in the truck at the truck scale. As for the second truck, 22,760 pounds were found in the truck, and only 21,000 pounds were reported to the Department of Fish and Game on the receipts. When looking at the truck loads in terms of weight bins, the second truck was reported as containing 42 buckets at 500 pounds each. Therefore, on the average the bins actually contained 541 pounds. The first truck purportedly contained

90 bins worth of squid reported as weighing 500 pounds each. In actuality, the average weight of the 90 bins was 531 pounds.

In May of 1980, defendants' business records were searched pursuant to a warrant executed by Warden Harmond, also from the Department of Fish and Game. Receipts for 1979 and 1980 (through Sept. 30) were studied. The receipts are turned into the department for tax purposes. Five hundred ninety-two receipts were involved in Harmond's investigation. Harmond looked at the records of Merchants Cold Storage, the company which received the squid from defendants' trucks after they left the wharf. Merchants Cold Storage refrigerates all the squid processed and packed by defendants. Their records reflect the net weight of defendants' squid, on a daily basis.

According to Harmond's investigation, defendants filled out receipts in 1979 which accounted for 5,554,074 pounds of squid. The records of Merchants Cold Storage, on the other hand, indicated defendants packed and stored 7,215,464 pounds of squid (a difference of 1,670,394 pounds). For 1980, Harmond found a difference of 640,864 pounds of squid.

Harmond discussed these discrepancies with defendants. Frank Cappuccio allegedly explained them as human error. He also told Harmond that bleaching could account for 20 percent of the difference because the squid are bleached before being weighed by merchants. Harmond testified that even if he was to allow 5 percent of the unloaded weight to be attributed to incidental material and water (32,043 pounds) and 12.3 percent of the remaining weight to be attributed to weight gain during the bleaching process (74,884 pounds), there still remained a total variance for 1980 of 533,937 pounds (or 19 percent).

The scale used by defendants to weigh the squid upon unloading from the fishing boats was a 1,000-pound scale with one-pound gradations. During 1979 and 1980, defendants purchased squid primarily from four fishing boats. The boats each had different hold capacities. There was defense testimony as to the rapid rate at which the squid are pumped from the holds and transported up the conveyer belt to the weighing bin, as well as testimony to the extent that the belts themselves are not stopped as a method of controlling the squid for purposes of weighing.

Nevertheless, of the 592 receipts submitted to the Department of Fish and Game which were later examined, 561 of the receipts were rounded off to the nearest 10 pounds or 100 pounds. On a number of days, the receipts for the squid unloaded from each of the four boats was identical.

Defendant Frank Cappuccio explained that boats which had not caught the limit were often credited with excess squid captured and unloaded from

the hold of other boats. He also stated that at times, the total squid landed for all four boats was added together and then divided by four in order to complete the filling out of the receipts.

Santo Cappuccio denied Ewald's testimony that weights amounting to 560, 570, and 590 pounds were recorded as 500 pounds. He also denied leaving the levers controlling the doors to the weight bins in a position so the doors remained open and squid passed through unweighed. He testified that he did 95 percent of the weighing and that it was the common practice among all buyers to put a slash or hash mark down for bin weights of 515 to 530 pounds.

Defendant Frank Cappuccio testified that bin weights were adjusted down from 525 to 500 pounds in order to account for scrap, junk fish, etc., which came out of the holds and travelled up the conveyer belts and found its way into the weight bin. The weight was further adjusted down from 500 pounds to 475 pounds to account for water which was in the weight bin. The 5 percent water weight was purportedly arrived at through an agreement with the Department of Fish and Game.

The "agreement" referred to by Frank Cappuccio was reached at a meeting on July 26, 1979. The meeting was called in response to the initial contacts the Department of Fish and Game representatives were having with the defendants on the wharf. Defendants provided the court with a copy of the minutes of the meeting. Representatives from the Department of Fish and Game, Division of Measurement Standards, Monterey County Weights and Measures, wholesale Fish Dealers and Packers, Boat Owners Association, Fishermen's Union of America were present. It was further agreed that after the 5 percent water allowance was deducted, an additional 5 percent would be deducted to account for trash and incidental matter. A member of the Boat Owners Association and a union "patrolman" also testified about the practice of subtracting 25 to 30 pounds from each bin.

## DISCUSSION

I. *Adverse Impact on Consumers Competition, or the General Public.*

■ Defendants first argue they could not be prosecuted under section 17200 without a showing of injury to consumers, competitors, or the public. Because no evidence of such injury was presented at trial, the argument continues, the evidence was insufficient as a matter of law.

Section 17200 provides: "As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by

Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

The People respond by arguing that section 17200 and its predecessor, Civil Code section 3369, have been construed to require no showing of actual injury to consumers or competitors. It is noted that in *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111-112 [101 Cal.Rptr. 745, 496 P.2d 817], the Supreme Court stated, in reference to Civil Code section 3369: "The language of section 3369, however, does not limit its coverage to such 'deceptive' practices, but instead explicitly extends to any 'unlawful, unfair *or* deceptive business practice'; the Legislature, in our view, intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, although most precedents under section 3369 have arisen in a 'deceptive' practice framework, even these decisions have frequently noted that the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable ' "new schemes which the fertility of man's invention would contrive." ' (*American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689, 698 [46 P.2d 135].) As the *Claibourne* court observed: 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. There is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, an equity court must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem.' (3 Cal.2d at pp. 698-699; . . . .) With respect to 'unlawful' or 'unfair' business practices, section 3369 specifically grants our courts that power." (Fn. omitted.)

In further support of its position, the Attorney General cites *People* v. *E.W.A.P., Inc.* (1980) 106 Cal.App.3d 315 [165 Cal.Rptr. 73]. This case concluded that anticompetitiveness or harm to the consumer need not be alleged in a section 17200 action where the unlawful business practice is a violation of a Penal Code section designed to protect the public. (See *People* v. *E.W.A.P., Inc., supra,* 106 Cal.App.3d at pp. 318-319.)

Defendants were accused of violating Fish and Game Code section 8011 and Business and Professions Code section 12512. Fish and Game Code section 8011 provides, in pertinent part: "Every person engaged in the business of buying, canning, curing, or preserving fish, or manufacturing meal, oil, flour, protein concentrate, animal food, or fertilizer from fish, or dealing in fish, who receives fish from fishermen, other than persons engaged in the taking, transportation, or sale of live freshwater fish for bait,

shall make a legible record in the form of a receipt in quadruplicate on forms to be furnished by the department.

"The receipt shall show: [¶] (a) The weight of each species of fish received.

". . . . . . . . . . . . . . . . . . . .

"(i) Such other statistical information as the department may require."

Section 12512 provides: "When the sale of any commodity is based upon a quantity representation either furnished by the purchaser or obtained through the use of equipment supplied by him, the purchaser shall in no case buy the commodity according to any quantity which is less than the true quantity. Violation of this section is a misdemeanor."

Clearly under the *Barquis* and *E.W.A.P.* cases, an actual injury to the consuming public or competitors was not required to be proven as an element of the offenses for which defendants were charged. Like the Penal Code section in *E.W.A.P.,* section 12512 and Fish and Game Code section 8011 were designed to protect the public. The Fish and Game Code protects the public's interest in fish and game. (See, e.g., *White* v. *Towers* (1951) 37 Cal.2d 727, 734 [235 P.2d 209, 28 A.L.R.2d 636]; *People* v. *Harbor Hut Restaurant* (1983) 147 Cal.App.3d 1151 [196 Cal.Rptr. 7]; Fish & G. Code, § 8010.) Section 12512 works in conjunction with the Fish and Game Code to achieve this purpose.

Second, the illegal conduct of defendants, in fact, injured the public, including other processors and the fishermen. As for the fishermen, they were not paid for the actual poundage delivered because the weight delivered was not recorded properly by defendants on defendants' scale. (§ 12512.) There was testimony the investigation started after fishermen complained. The public was injured to the extent the Department of Fish and Game was not accurately apprised of the amount of squid taken so that it could properly protect the public's interest in the squid fishery. Further, by reporting less squid than was landed, defendants avoided paying taxes to the state, and therefore to the public. (See Fish & G. Code, § 8045.)

Defendants' argument that no evidence was presented showing their conduct had an adverse impact on consumers and the public must therefore fail, assuming we accept the argument that such a showing was required.

■ Imbedded in this issue is a second argument: the prosecution was required to show defendants' conduct of underweighing the squid landed was done with the *intent* of injuring competitors or destroying competition.

Defendants agree there is an absence of "intent" language in section 17200, but argue this is not dispositive.

The question of whether intent or knowledge "is an essential element of permitting an act proscribed by statute is a matter of construction to be determined by considering the subject matter of the statute, its language, the evil sought to be prevented, its obvious purpose, and the consequences of the several constructions to which the statute may be susceptible. (*People* v. *Daniels*, 118 Cal.App.2d 340, 343 [257 P.2d 1038]; 14 Cal.Jur.2d 268, § 81.) 'Statutes punishing the sale of adulterated or mislabeled foods, penalizing the selling of commodities on the basis of falsely stated weight or measure, prohibiting the sale of intoxicating liquor, or prohibiting the mere possession of certain objects are examples of legislation positively forbidding certain acts and imposing criminal liability regardless of knowledge.' (14 Cal.Jur.2d 269, § 81.) Where 'qualifying words such as knowingly, intentionally, or fraudulently are omitted from provisions creating the offense it is held that guilty knowledge and intent are not elements of the offense.' (*In re Marley,* 29 Cal.2d 525, 529-530 [175 P.2d 832].)" (*Brodsky* v. *Cal. State Bd. of Pharmacy* (1959) 173 Cal.App.2d 680, 688 [344 P.2d 68].)

In discussing Civil Code section 3369, the Supreme Court quoted with approval from *Payne* v. *United California Bank* (1972) 23 Cal.App.3d 850, 856 [100 Cal. Rptr. 672], which stated the section protected the public from the probability or likelihood, in addition to the actuality, of confusion or deception. (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 876 [127 Cal.Rptr. 110, 544 P.2d 1310].)

In *Chern,* the court was concerned, in part, with interpreting section 17500. The court found the language of the section to be broad enough to include false or misleading statements made *to the public,* and that under the section a statement would be considered false or misleading if members of the public were *likely* to be deceived. It was therefore unnecessary to look to the intent of the party violating the statute.

In the present case, there can be no doubt members of the public, as well as the Department of Fish and Game, would likely be deceived were they to rely upon defendants' characterization of the weight of the squid landed. Defendants' argument that intent is an element which needed to be proven to establish a violation under section 17200 must therefore fail.

## II. *Evidence of Custom.*

Defendants next argue that even if section 17200 applies, no violation by defendants can be shown because the court improperly excluded

from consideration the evidence presented by defendants on the industry custom and practice of weighing squid. They argue that all the Fish and Game Code section 8011 and Business and Professions Code section 12512 required defendants to do was to submit a legible record, in the form of a receipt, showing the true quantity of squid purchased. Defendants argue it would be impractical to remove all the trash fish and incidental matter prior to weighing the squid. As a result, the only way to obtain a true quantity of squid purchased would be to estimate the amount of trash fish and incidental materials in each bin, and deduct it prior to filling out the receipt. In its decision, the court stated: "Defendants' argument that there was an accepted custom between buyers and sellers of squid that adjustments could be made by running the load a little heavy and recording an arbitrary figure is simply not relevant. The Legislature set requirements and those requirements must be followed." Just prior to making this statement, the court characterized defendants' method of adjustments as "casual," and noted such a method was "wide open to abuse."

Defendants had provided the court with considerable testimony regarding practices in the industry, based upon their 35 years of experience. This included testimony about adjustments for trash fish and incidental material discussed in the earlier mentioned meeting between buyers, boat owners, union members, and various government entities.

Defendants rely heavily upon *Fries* v. *Anderson, Clayton & Co.* (1961) 190 Cal.App.2d 667 [12 Cal.Rptr. 336], for the argument that such evidence is relevant to the question of whether a violation has been committed. However, the *Fries* case is not helpful to defendants. The *Fries* court found section 12512 inapplicable in a situation where "the sale price of the commodity sold is determined by the application of a formula devised for the express purpose of obviating the necessity for an actual weighing of the commodity purchased. Even assuming, as the plaintiffs contend, that the weight of the seed at the oil mills was its actual scale weight at the time of ginning, the defendant made no representation respecting such weight; the representation made by the defendant was that the quantity of seed sold to it as determined by the industry's formula from the figures presented on its ginning statement was expressed in a stated number of pounds, for the purpose of determining the purchase price thereof, in accord with their agreement; there is no contention that this representation was false; and, consequently, there is no misrepresentation within the purview of the code section in question. In addition, the defendant did not furnish 'the weight, measure, or weighing or measuring instrument by means of which the amount, weight, measure, or quantity of the commodity bought' was determined, except with respect to the cotton and the lint; there was no weighing of or weighing instrument for the seed; there was no measure except as the application of the formula constituted a measure; and there is no contention

that the weight of the cotton or the weight of the lint or the result of the formula application was incorrect." (*Id.* at pp. 678-679.)

Unlike *Fries,* in the present case there was no standard industry formula agreed to by the parties which avoided the necessity of weighing the product purchased. The present case is further distinguishable from *Fries* by the fact that there is a contention the weight based on defendants' purported formula was incorrect as to the amount of squid landed, and the weighing instruments were furnished by defendants.

Finally, as the Attorney General notes, fairness, as based upon an industry-wide custom and practice, is not a defense in this case. Irrespective of the asserted fairness of the practice, it is in fact unlawful and therefore enjoinable. (*Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d at p. 112.) If a defense is available, it must be found on the face of the underlying statute; therefore, proof that they recorded the true quantity of squid, as required by Fish and Game Code section 8011 and Business and Professions Code section 12512, would be the only defense to this section 17200 complaint. (See *Hobby Industry Assn. of America, Inc.* v. *Younger* (1980) 101 Cal.App.3d 358, 371-372 [161 Cal.Rptr. 601].)

### III. *Substantial Evidence.*

■ Defendants argue there was a lack of substantial evidence to support the verdict finding them to have violated Fish and Game Code section 8011 and Business and Professions Code section 12512. We disagree. Defendants readily admitted recording weights down by hash mark and that the mark did not represent the weight measured by the scale. There was also the observation of misweighing by a fish and game warden, which the court was free to believe over statements to the contrary offered by defendants. Further, there was the comparison of the content of vehicles loaded by defendants as compared with the receipts turned in to the Department of Fish and Game which purportedly represented the amount of squid the trucks contained.

### IV. *Due Process.*

■ Defendants next argue the relevant code sections have been unconstitutionally applied to them in violation of the due process clauses of the United States and California Constitutions. They argue the statutes were applied in such a way as to charge them for not recording the weight of squid, trash fish, and incidental material, while at the same time the state did not introduce any evidence showing the formula accepted by the fish processing industry for calculating the weight of squid was unreasonable or did not reflect the true weight as required by the statutes. Again defendants

rely heavily, indeed exclusively, upon the importance of the minutes taken of the meeting held on July 26, 1979. Under this same constitutional analysis, defendants argue the penalty violated the due process clauses because they were excessive.

The court below expressed concern over the adjustments to the weight being made by defendants and the asserted belief of defendants that these adjustments were pursuant to an agreement with the Department of Fish and Game. The court concluded that if adjustments were to be made, the adjustments should have been agreed to and recorded in a way so they could later be recognized and measured.

Both statutes are clear on their face: one requires the recording of the weight of each species of fish a purchaser receives (Fish & G. Code, § 8011, subd. (a)); the other requires that the true quantity received be reported. (Bus. & Prof. Code, § 12512.)

The fact the industry itself may have been in violation of the Fish and Game Code and Business and Professions Code is not a defense. (*People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 528 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].) The statutes in this case are not arbitrary or unreasonable, and their application in this case was, itself, reasonable. The purposes of the statutes, to have an accurate recording of the squid taken, is a reasonable one. There is a substantial relationship between the sections involved and the object they seek to attain. (See, e.g., *Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904].)

The enforcement in this case was by no means arbitrary. The defendants were warned that they must accurately record the amount of squid landed, and in fact presented evidence that the method of recording, and percentage of allowance for water, etc., was at issue at the time some of the earliest violations took place.

Defendants also argue that as applied, the statutes punished them for failing to indicate the *untrue* weight of squid: that is, requiring them to include in the weight of squid the weight of fish and material which was not squid. (See *Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 762-763 [221 Cal.Rptr. 779, 710 P.2d 845].) This argument must fail since defendants at all times had within their means the power to do exactly what it was the statutes required: sort out, as much as possible, the trash fish and incidental material prior to weighing the squid.

Finally, defendants strain a reasonable interpretation of the record by their continued insistence that their method of calculating the true weight of squid was ratified or agreed to by the Department of Fish and Game. Their copy of the minutes of a meeting and the testimony of defendant

Frank Cappuccio provide the bulk of their evidence on this issue. A review of the exhibit simply does not confirm an agreement on the part of the state, or appropriate state agency, to allow such a deviation from the code sections in question.

Indeed, as previously noted, defendants were warned that the true weight must be recorded. There was also considerable testimony regarding confrontations between defendants and representatives from the Department of Fish and Game who were monitoring the weighing of the squid. Defendants surely must have been aware, or can be held to have had reasonable notice, of a problem with their weighing method and the department's interpretation of state law. Defendants' contention the doctrine of equitable estoppel should be applied must therefore fail. To do so under these circumstances would nullify Fish and Game Code section 8011. As a question of fact, the court below found no agreement was entered into. This conclusion is supported by substantial evidence. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423]; *Killian* v. *City and County of San Francisco* (1978) 77 Cal.App.3d 1, 14 [143 Cal.Rptr. 430].)

As for the question of whether the penalties imposed were unconstitutionally excessive, this argument likewise fails. Five hundred ninety-two violations of Fish and Game Code section 8011, and Business and Professions Code sections 12512 and 17200 were found. As the court below observed, the penalty amounted to only $124.20 per violation. Section 17206 allows for a maximum penalty of $2,500 per violation. Literally tens of thousands of pounds of squid were involved in these violations. The total fine imposed included $12,000 for investigative costs incurred by the government, as well as $886.30 in taxes which were avoided by underpayment to fishermen amounting to $60,641.75. There is no doubt the court had a duty to impose a penalty for each of the separate violations (*People* v. *National Association of Realtors* (1984) 155 Cal.App.3d 578, 585 [202 Cal.Rptr. 243]), yet acted well within its discretion by limiting the fines to the extent that it did.

Finally, it is also noted the financial condition of defendants did not preclude the imposition of a fine in the amount of $73,528.05 under the facts of this case. There was testimony the gross income for U. S. Freezer was over $1.5 million in 1979. There was also testimony from defendant Santo Cappuccio that his salary from U.S. Freezer was $75,000 in that year. In selecting the amount of the penalty to be imposed, the court may consider the defendant's financial condition, and if the penalty imposed is sufficient to deter such conduct in the future. (*People* v. *Superior Court (Kardon)* (1973) 35 Cal.App.3d 710, 712-713 [111 Cal.Rptr. 14].)

## V. *Conduct During a Time Period Not at Issue.*

 Defendants last argue the court considered, when calculating penalties, fish receipts issued by the defendants after the Department of Fish and Game investigation had ended. They point out that the fish and game receipts issued through September 30, 1980, showed defendants purchased 5,600 buckets of squid. The court, on the other hand, calculated the penalty by using 6,487 buckets as the number purchased in 1980. They seek an adjustment of the penalty on this basis. This argument fails due to the fact the complaint alleged the continuing violations began at an unknown date, but were at a date no earlier than four years prior to the filing of the complaint. The complaint was filed in September of 1981. The prosecution stipulated that the years at issue were 1979 and 1980. Finally, the court's calculations, inasmuch as they related to the number of buckets weighed, came from testimony by defendant Frank Cappuccio. As a result, the court did not err in using the higher figure for 1980.

The judgment is affirmed. Respondent to have costs on appeal.

Best, J., and Ballantyne, J., concurred.