[No. B020395. Second Dist., Div. Seven. Mar. 19, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY BAUMGART, Defendant and Appellant.

COUNSEL

Linn Davis for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Donald J. Oeser and William H. Davis, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, P. J.—A jury found defendant Roy Baumgart guilty of six felony counts of the sale to six victims of securities without a permit (counts 19, 28, 31, 36, 56, and 58; Corp. Code, §§ 25110 and 25540) and guilty on count 59 of the felony of using false statements in the sale of securities (Corp. Code, §§ 25401 and 25540). The jury acquitted defendant on six counts of grand theft (Pen. Code, § 487, subd. 1).[1]

---

[1] Codefendants Robert Gomez and/or Paul Curtis were charged on counts 1 through 59, other than those set out above, with grand theft, sale of securities without a permit, and non-sufficient funds, involving 14 other victims. Gomez was also charged along with Baumgart on counts 19, 28, 31, 36, and 56. Gomez pleaded guilty and did not go trial with Baumgart and

Proceedings were suspended and defendant was placed on five years' formal probation on certain terms and conditions one of which was that defendant pay restitution of $106,500. He appeals from the judgment.

Appellant claims that as to count 59 the court erred in failing to instruct the jury on criminal negligence; contends as to the other counts (selling securities without a permit) that this court should disregard existing authority that the offense is a strict liability crime and should import an element of knowledge or intent; and challenges the validity of the restitution order, claiming that the portion of the $106,500 imposed for selling securities without a permit, to wit, $57,900, represents victims' losses not proximately caused by his criminal conduct, but by the fraudulent scheme of codefendant Gomez.

FACTS

*Prosecution Case*

 A. *Sale of Securities Without a Permit to Day, Figurski, Heinz, Lambert, Wojciechowski (Counts 19, 28, 31, 36, and 56).*

In 1978 defendant was employed selling insurance when he met Robert Gomez through their church; Gomez asked defendant if he knew anyone who might be interested in investing in equity real estate purchases; defendant referred his insurance clients to Gomez and defendant received commissions from Gomez; defendant would get 10 percent of the money invested and another 6 percent if the investor reinvested the same money. In 1979, defendant formed his own insurance agency and rented office space from Gomez; defendant began to spend 25 percent of his time referring clients to Gomez; in late 1979 or early 1980, defendant went to work full-time as a commissioned salesman for Gomez's company, Financial Designs, until he left in January 1982.

Defendant was told that Financial Designs would be raising money, that another of Gomez's companies, Homeowner's Equity, would then use the money to buy properties, fix them up, and resell them. Gomez was president and owner of the company; defendant had no authority in the company other than as a salesman to solicit funds; most of the time defendant signed the investment agreements of the people he solicited, while Gomez made out the grant deeds and acquired properties; after about a year with Gomez,

---

Curtis. The jury convicted Curtis of six counts, other than those involving Baumgart, of sale of securities without a permit. Curtis was also convicted on counts 58 and 59. Curtis is not a party to this appeal.

defendant was allowed to select properties for investors from a black notebook, which contained a legal description of the property, its market value, and equity.

At one time, before defendant left Gomez's company, defendant was told he was made president, but his authority and duties did not change.

In January 1982, defendant and codefendant Paul Curtis, defendant's brother-in-law, formed their own company, California Diversified Investors.

Neither defendant, Gomez, Curtis, nor any of their companies had a permit to sell securities and they were granted no exemption from the permit requirement. In the opinion of the supervising counsel of the enforcement division of the California Department of Corporations, all of the investment contracts and promissory notes involved in this case were securities.

The following facts relate to counts 19, 28, 31, 36, and 56, which involve transactions arising out of defendant's activities on behalf of Financial Designs.

In August 1981, Joyce Figurski's husband answered an advertisement about an investment in the Ontario Pennysaver; defendant came to their home and told her the company used investors' money to buy up properties in foreclosure and sell them at a profit, they handled three to seven a week and the company had many homes and land and was "very safe." The Figurskis met with defendant twice and Gomez once before investing; defendant told Joyce Figurski that she would be the only investor on the properties, that she would get a copy of a title report on the properties and, as security, she would get a grant deed and a trust deed. Joyce Figurski gave defendant a check for $20,000 for a six-month investment; she received an investment contract and a grant deed as security; defendant told her that the grant deed could not be recorded until after 180 days if they were not paid.

When the investment came due in February 1982, Figurski got a bad check for the interest due; she was told that the only way they could get their money back was to reinvest in four separate $5,000 investments; the Figurskis never got any of their money back; they discovered that a grant deed was "phony," for a nonexistent piece of property. The Figurskis never got a copy of any title report.

Walter Wojciechowski saw an advertisement about a company offering a 20 percent interest payment; he called the company, and defendant, who

introduced himself as a representative of Financial Designs, came out to his home; defendant gave him a choice of two properties in which to invest; he chose one and withdrew $15,000 from a T-bill in a savings and loan and gave it to defendant in December 1980; defendant told him the company would pick up what Wojciechowski would be losing for pulling funds out of the T-bills early. Wojciechowski received a deed and a note. In June 1981, Wojciechowski reinvested for six months, turned in his deed and note, and received new documents; in this transaction, he dealt with Gomez; defendant had introduced him to Gomez; Wojciechowski understood they were equal partners in the company.

In April 1982, Wojciechowski tried to get his money out; Gomez said he could have it May 1; on May 15, 1982, Wojciechowski found out that the company had no money in the bank and there was no way he could get any money; he never got any money back from Gomez or defendant.

In August 1980, John Heinz gave defendant $12,000 for investment and received a grant deed; defendant told him the investment would be for six months, he would receive 15 to 20 percent interest, and if after six months Heinz did not get his money back, he could take over the property. Heinz got an interest payment and rolled over the principal into a new investment; he got new documents and a new investment agreement. In late 1981, Heinz gave defendant another $10,000 to invest; even though defendant told him he could get his money back any time he needed it, he received nothing. Defendant did not tell Heinz that others would be given grant deeds to the same property. Defendant told Heinz that he was a partner at Financial Designs; when defendant left that company to form a new company, defendant asked Heinz to invest in it, but Heinz did not do so.

Theron Lambert knew both defendant and Gomez from their church affiliation; from October 1980 to early January 1982, the Lamberts engaged in a total of 15 transactions with defendant; some of the transactions were reinvestments or rollovers of prior investments. At the time defendant resigned from Financial Designs in January 1982, the Lamberts held promissory notes indicating they had invested $107,000.

Defendant told Lambert that his money would be used to assist Financial Designs in purchasing property; the security was to be in the form of a promissory note, a grant deed to the property to be purchased, and an investment agreement. Defendant signed the investment agreements and Gomez signed the promissory notes and grant deeds. In early 1982, defendant telephoned Lambert to tell him that two investments had been rolled over, even though the Lamberts had not given their approval. When Lambert learned that defendant was resigning from Financial Designs, he

arranged a meeting with Gomez. In the spring of 1982, Gomez made out a check to Mrs. Lambert for about $13,000, which was a bad check; they never got any money from it, although in September 1982, Gomez gave them $500. None of the grant deeds given to the Lamberts as security for their investments proved worth the cost of going after; one of the properties did not belong to Gomez and some of the deeds contained inaccurate legal descriptions such that the title company could not prepare a property profile.

In April 1981, another investor, Owen Day, gave defendant $10,000 for investment; defendant told him that Financial Designs needed six months to buy property, rehabilitate it, and sell it for a profit. Day received a grant deed, promissory note, and investment agreement; defendant told him that if anything went wrong with the investment, Day could record the deed and the property would be his, but Day could not record the deed until the due date of the investment in six months. In October 1981, Day received an interest payment and rolled over the $10,000 into another property, receiving a new set of documents. He was never told that other people would be given grant deeds to the same property.

At that time, defendant also told him of a "fantastic investment" in property in the San Gabriel Valley for a short term; the property was already in escrow and the investment offered 10 percent in 30 days; Day gave defendant $25,000 for this investment. In November, Day received a check for $17,100, but it "bounced"; in March 1982, Day was told by Gomez that defendant was no longer with Financial Designs. Day expected full payment on his investments, but all he received was a $3,000 check from Gomez; Day lost $32,000 of principal.

B. *Sale of Securities Without a Permit; False Statements in Sale of Securities to Nancy Violette (Counts 58 and 59).*

In 1980, Mrs. Violette met defendant at a church seminar on financial investments; in late summer 1982 defendant telephoned her and asked her if she had any money to invest; Violette had several meetings with defendant, who told her his company, California Diversified, would buy distressed properties, fix them up, and resell them; there was a good deal of profit there and she would gain a good return on her money because she would be investing in his company; as security, she would have trust deeds on the properties; because defendant would tell her about the first mortgage on various properties and point out to her the difference between that and the value of the property, she understood she was going to get a second trust deed. The investment agreement provided, and defendant promised Violette, that she could get her money back any time with 45 days' notice and

that defendant would not encumber any property with more than 90 percent of its value.

Between August 1982 and March 1983, Violette invested about $161,000 with California Diversified; before her first investment and on a number of other occasions, she went with defendant and codefendant Curtis to see the homes, to see "what [her] collateral looked like." On her first investment, in August 1982, for $15,000, she was to receive 30 percent interest in six months. She gave defendant $15,000 and received a trust deed, a promissory note, and an investment agreement. When Violette reinvested this money, she received a promissory note and investment agreement.

In October 1982, Violette gave defendant a check for $11,000 as a loan, to be repaid in six weeks, as he "needed some money to tide him over." When the loan was due, she invested the funds with defendant; in late November or early December 1982, she also invested another $35,000, for which she received promissory notes and investment agreements; she did not get trust deeds for these investments, even though she was taken to see property and told her trust deeds would be seconds. Defendant said he needed more money, so Violette went to her mother and aunt, and talked them into investing with defendant; Violette, on behalf of her mother and aunt, invested $26,000 with defendant and received promissory notes and investment agreements.

Violette had about $57,000 in annuities in Kemper Life Insurance; defendant told her Kemper was not a good company and he would get her out of that company and into a good annuity; based on defendant's representations that he would give her the money she lost in penalties from withdrawing her funds with Kemper in the form of a larger investment with him, Violette took the money out with penalties in March 1983; for this investment she was given three separate promissory notes and investment agreements.

When Violette gave defendant the $57,000, he and Curtis told her that they wanted her to hear from them first that they had been charged by the district attorney, but "this was a company that they have only worked for and they were strictly salesmen and they had nothing to do with the fraud." In a "very reassuring" conversation, defendant told her not to worry, she was safe; she still "definitely" trusted him and Curtis and invested her $57,000. A day or two after this investment, at a church dinner, she heard some conversation about defendant and Curtis; the next morning, she went to defendant's home, although defendant told her never to come to his house; she had a "very unpleasant" meeting with defendant and for the first time she got "really bad vibes" about the safety of her money. At that time,

Violette demanded that defendant make out trust deeds for all of her investments. On the following Monday, Violette waited in defendant's office all day until late in the day defendant and Curtis came with some copies of trust deeds, telling her that the originals were to be recorded. Violette discovered that the amounts on the trust deeds did not match the amounts on her notes; they were not second trust deeds, but thirds, fourths, fifths and even sevenths; moreover, about $40,000 of the money she had invested remained unsecured.

When Violette asked for collateral in his home, defendant said it was all tied up; defendant pointed out that the agreement provided that she could get her money back in 45 days, but he asked her to demand only the $40,000, which she did. Violette never got the $40,000 back; although it was only a few days after she had given him $57,000, defendant told her he did not have the money.

When Violette did not get her $40,000 back, she and her attorney met with defendant, Curtis, and their attorney in mid-April 1983 and demanded new trust deeds to secure all of Violette's investments; defendants did not have enough properties or enough equity in the ones they did have to secure all of her investments and Violette did not want to wait for them to acquire several properties then under negotiation, so Violette was given new trust deeds for five properties, even though some of them were overencumbered; $40,000 of her money was never secured by any property. On one trust deed, four other investors had trust deeds senior to hers. Soon after receiving the trust deeds, she discovered that all of the properties were in default as well; defendant told her to ignore the notices of default, that everyone gets them.

In July 1983, defendant deeded one property to Violette, who was able to sell it for $115,000 after paying off encumbrances of about $80,000; as Violette carried back a first mortgage on the property for $75,000, she was also receiving interest payments of about $10,000 a year. Violette collected no money from the other trust deeds.

*Defense*

Defendant testified on his own behalf that when he was working for Gomez, someone asked him if the transaction was a security; defendant did not know what a security was and asked Gomez about it; Gomez told him it was not a security and explained why, but defendant did not understand the explanation; defendant did not believe he was dealing in securities.

Defendant denied promising Mrs. Figurski a title policy and claimed he would have said only that one was on file with the company. He denied

representing himself as a partner of Financial Designs and denied knowing that some of the grant deeds given to Financial Designs' investors were for nonexistent property or for property not owned by Gomez or his companies.

As to Mrs. Violette, defendant denied promising her any particular position on the trust deeds, or any particular property as security; she was investing in the company and not a particular property. Defendant admitted, however, that he promised Violette that all of her investments would be secured by trust deeds, but by the end of March 1983, $40,000 of her investments remained unsecured. Defendant also admitted that he did not tell Violette that his company was in default on several properties for which she held a trust deed, and that the company's failure to pay mortgage payments on its property was a calculated business practice if they felt that it would be to their advantage to use the money to purchase more properties. Defendant considered that investors did not need to know this company practice.

Curtis also testified on his own behalf that two attorneys and a specialist whose courses he attended all told him that the transactions in which they were involved did not constitute securities transactions. Curtis also testified that they could not return Violette's $40,000 because they needed it to pay other investors and expenses, although he could not say who or how many other investors there were, but believed there were less than 20; Curtis believed that had Violette not interfered, they would have been able to repay her $40,000 within the 45-day contractual provision; he believed they would have been able to raise the money from another investor or from the sale of some of their properties. Curtis also admitted that had Violette demanded the return of all of the money she had invested, "It would have killed us. We would have had to close the business down." Neither Curtis nor defendant had invested any of their own money in the business. At the time they obtained Violette's $57,000, they had not sold any properties they had purchased, although two of the homes were occupied under leases with options to buy.

I

INSTRUCTION ON COUNT 59, VIOLATION OF CORPORATIONS CODE SECTION 25401

■ Appellant contends that the court erred in failing to instruct the jury as to count 59, that "the standard of conduct condemned by Corporations Code section 25401 is criminal negligence." He claims that the court should have given a modified version of CALJIC No. 3.36, defining

criminal or gross negligence.[2] Respondent contends that the violation is a strict liability offense and thus the court was not required to instruct on criminal negligence, nor was it required to instruct as it did (see fn. 2, *ante*), so the instruction given was not prejudicial. We agree with respondent.

Corporations Code section 25401 provides: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

At the time of the offense, Corporations Code section 25540 provided in pertinent part that "Any person who willfully violates any provision of this law . . . shall upon conviction be fined not more than ten thousand dollars ($10,000) or imprisoned in the state prison or in a county jail for not more than one year, or be punished by both such fine and imprisonment . . . ."

■ "Both the Legislature and the electorate have the power to enact criminal statutes which define the elements of crimes. [Citations.] A fortiori, they also have the power to determine which defenses will exist and the mental states required for the commission of crimes." (*People* v. *McCowan* (1986) 182 Cal.App.3d 1, 12 [227 Cal.Rptr. 23].)

---

[2] In discussing the jury instructions, the prosecution apparently agreed with the trial court's statement that "count 59 deals with negligence, not with intent," and "which has to do with knowing or reasonably knowing the falseness of the statement . . . ."

The court instructed as to count 59 in pertinent part as follows: "In the crime charged in count 59 in the information, namely, sale of a security by untrue statement and/or omission of fact, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator and unless such mental state exists the crime to which it relates is not committed. . . . [¶] Defendants are charged in count 59 with selling or offering to sell a security by untrue statement and/or omission of a material fact, a violation of Corporations Code section 25401. Under this law, every person who willfully and knowingly offers or sells a security in this state by means of any written or oral communication which includes either an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, is guilty of a crime. . . . This instruction requires that the prosecution prove that the defendants knew or in the exercise of reasonable care should have known of the untruth of the fact stated or the importance of the material fact omitted at the time of the offer to sell or the sale in question. . . . You may not find the defendants guilty of this offense unless the required mental state existed at the time of the offer to sell or the sale of the security in question. [¶] It is a defense to count 59 . . . that the defendants . . . 1. exercised reasonable care and did not know of the untruth or omission; or 2. that even if the defendants had exercised reasonable care, he or they would not have known of the untruth or omission; or 3. that the investor knew the facts concerning the untruth or omission. If in light of this instruction and after a consideration of all the evidence, you have a reasonable doubt as to whether or not the defendants or the investor had the requisite mental state at the time of the sale or offer to sell as to any untrue statement of fact or omission of material fact, then the defendants are entitled to an acquittal of count 59 only."

■ "The fundamental rule of statutory construction is that the court ascertain legislative intent so as to effectuate the purpose of the law. . . . [T]he court cannot create an offense by enlarging a statute, by inserting or deleting words, or by giving the terms used false or unusual meanings. [Citation.] The court must give effect to statutes according to the usual, ordinary import of the language employed in framing them. When statutory language is clear and unambiguous, there is no need for construction, and courts should not indulge in it." (*People* v. *Stepney* (1981) 120 Cal.App.3d 1016, 1019 [175 Cal.Rptr. 102].)

■ Corporations Code section 25401 contains nothing pertaining to the mental state accompanying the unlawful acts described therein; section 25540 imposes criminal penalties on those who "willfully" violate section 25401. "The word 'wilfully' when used in the penal statutes means 'simply a purpose or willingness to commit the act or to make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.' (Pen. Code, § 7.) Thus, the courts have consistently held that even where the statute requires a 'wilful' violation, public welfare offenses in general are punishable without proof of criminal intent." (*People* v. *Gonda* (1982) 138 Cal.App.3d 774, 779 [188 Cal.Rptr. 295].) Thus, "the Legislature intended section 25540 to preserve strict criminal liability for violations of the Corporate Securities Law." (*People* v. *Clem* (1974) 39 Cal.App.3d 539, 542 [114 Cal.Rptr. 359] [construing §§ 25540 and 25110].)

In light of the clear expression of the Legislature that criminal penalties attach for "willful" violations of section 25401, we conclude that the statute by necessary implication excludes knowledge or criminal intent as an element of the offense. (*People* v. *Johnson* (1989) 213 Cal.App.3d 1369, 1375-1376 [262 Cal.Rptr. 366].)

We reject appellant's implied assertion that Penal Code section 20 requires that Corporations Code sections 25401 and 25440 be construed to require some form of criminal intent or criminal negligence. "The common law principle that there must be a union of act and wrongful intent, expressed in [Penal Code] section 20, although basic, is not inviolable. [Citations.]. . . ■ Under many statutes enacted for the protection of the public health and safety, . . . criminal sanctions are relied upon even if there is no wrongful intent . . . Whether a criminal intent or guilty knowledge is a necessary element of a statutory offense is a matter of construction to be determined from the language of the statute, in view of its manifest purpose and design. There are many instances in recent times where the Legislature in the exercise of the police power has prohibited, under penalty, the performance of a specific act. The doing of the inhibited [*sic*] act constitutes the crime, and the moral turpitude or purity of the motive by

which it was prompted and knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt. The only fact to be determined in these cases is whether the defendant did the act. In the interest of the public the burden is placed upon the actor of ascertaining at his peril whether his deed is within the prohibition of any criminal statute." (*People* v. *Corkrean* (1984) 152 Cal.App.3d 35, 38 [199 Cal.Rptr. 375], internal quotation marks omitted.)

■ As the cases emphasize, the main objective of the securities law is to protect the public against the imposition of insubstantial, unlawful and fraudulent stock and investment schemes and to promote full disclosure of all information that is necessary to make informed and intelligent investment decisions. (*People* v. *Park* (1978) 87 Cal.App.3d 550, 565 [151 Cal.Rptr. 146].) A violation of Corporations Code section 25401 thus falls within the class of cases involving "acts that are so destructive of the social order, or where the ability of the state to establish the element of intent would be so extremely difficult if not impossible of proof, that in the interest of justice the legislature has provided that the doing of the act constitutes the crime, regardless of knowledge or criminal intent on the part of the defendant. [¶] In these cases it is the duty of the defendant to know what the facts are that are involved or result from his acts or conduct." (*In re Marley* (1946) 29 Cal.2d 525, 529 [175 P.2d 832], internal quotation marks omitted.)

■ In the instant case, appellant was in a position to avert the public danger prohibited by the statute and avoid criminal liability by fully informing Mrs. Violette about the practices and operation of his business so that she could not claim there had been the sale of a security by means of any untrue statement or omission of a material fact. We thus conclude that the trial court did not err in failing to instruct the jury on count 59 pursuant to the principles of criminal negligence embodied in CALJIC No. 3.36.

*Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705 [136 Cal.Rptr. 871], lends no support for appellant's proposition that Corporations Code section 25401 is not a strict liability offense. That case dealt only with the issues of whether a complaint in a civil case stated a common law fraud cause of action or whether the Corporate Securities Law of 1968 superseded such common law cause of action (67 Cal.App.3d at pp. 710-711), and if so whether the complaint stated such causes of action. In discussing the difference between common law negligent misrepresentation and a civil cause of action under Corporations Code sections 25401 and 25501, the court stated: "Sections 25401 and 25501 differ from common law negligent misrepresentation in that: (1) proof of reliance is not required, (2) although the fact misrepresented or omitted must be 'material,' no proof of causation

is required, and (3) plaintiff need not plead defendant's negligence. [Citation.] To avoid any implication that strict liability is involved, the Legislature provided that as a defense the defendant may: (1) prove that he exercised reasonable care and did not know of the untruth or omission, (2) show that even if he had exercised reasonable care, he would not have known of the untruth or omission, and (3) show that the plaintiff knew the facts concerning the untruth or omission. (Corp. Code, § 25501 . . . .)" (67 Cal.App.3d at p. 715.)

■ ■ ■ ■ It is clear that the court in *Bowden,* in referring to strict liability, was discussing the elements of and defenses to a civil action for violation of section 25401, which civil action and defenses are set out in section 25501.[3] ■ That section has no application to a *criminal prosecution* for a willful violation of section 25401. The concept of willfulness in section 25540 is incompatible with the defense of lack of knowledge set out in section 25501; moreover, we must presume that the Legislature was aware of the distinction between "willful" and "knowing" violations, and if it had intended the latter as the standard for criminal culpability in section 25440, it would have used the word "knowingly" in section 25540. Nor can section 25501 be construed to afford a defense: "If a defense is available, it must be found on the face of the underlying statute." (*People* v. *Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 763 [251 Cal.Rptr. 657].) We thus conclude that section 25501 and *Bowden* are inapplicable.

---

[3] Corporations Code section 25501 provides in part that "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission. . . ."

It was apparently the trial court's mistaken application of this statute, dealing with a civil cause of action, to the instant case which resulted in the instructions as to count 59. (See fn. 2, *ante*.)

We find no anomaly in a situation where a defendant in a civil suit based on section 25401 has a defense based on knowledge of the plaintiff or the defendant's exercise of reasonable care, but a defendant in a criminal prosecution does not. "It has long been the rule in criminal prosecutions that the contributory negligence of the victim is not a defense. [Citations.] In order to exonerate a defendant the victim's conduct must not only be a cause of his injury, it must be a superseding cause. 'A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. . . .' " (*People* v. *Armitage* (1987) 194 Cal.App.3d 405, 420 [239 Cal.Rptr. 515].)

Whatever may have been its reasons, we conclude that the Legislature was entitled to and did distinguish between the elements of a civil cause of action and the elements of a criminal offense based on a violation of section 25401.

The trial court did not err in failing to instruct the jury on criminal negligence as to count 59.[4]

## II

### SELLING SECURITIES WITHOUT A PERMIT

### *(Counts 19, 28, 31, 36, 56, 58)*

Although appellant acknowledges that case authority interpreting Corporations Code sections 25110 and 25540 (selling securities without a permit) provides that the offense is one of strict liability, he contends that "this rule is wrong, for the reasons stated by Justice Newsom, in his dissent in *People v. Schock* (1984) 152 Cal.App.3d 379 . . . ." We conclude that appellant's plea for a change in existing law is more appropriately addressed to the Legislature.

## III

### RESTITUTION

 As a condition of probation, appellant was ordered to pay restitution of $106,500. Appellant challenges the validity of a portion of that sum, $57,900, which represents 30 percent of the losses of the victims in counts 19, 28, 31, 36 and 56, referred to by appellant as the "Gomez investors." He claims that the proximate cause of their losses was Gomez's fraudulent scheme and "where the crime is failure to obtain a permit, restitution is proper only if the record is clear that the loss suffered by the investors was proximately caused by the failure to obtain a permit and not proximately caused by a fraud committed by some other party."

Appellant cites *People v. Feno* (1984) 154 Cal.App.3d 719 [201 Cal.Rptr. 513], which does not support his position; moreover, the pertinent language in *Feno* is clearly dicta, offered for the guidance of the trial court at retrial and only if Feno were again to be convicted. (154 Cal.App.3d at pp. 731, 734.) The court in *Feno* merely noted that "[a]lthough restitution may serve a rehabilitative purpose and may be ordered in cases involving unlawful sales of securities without permits [citations], the amount ordered must be supported by a factual record . . . ." (*Id.*, at p. 735.) The court noted that

---

[4]Although the court in the instant case did erroneously instruct the jury essentially that they could find criminal liability based on the violation of a standard of ordinary care, and also gave appellant a defense to which he was not entitled, appellant certainly can claim no prejudice as a result of the error.

as to the amount of restitution, $51,000, the record was "unclear whether that sum was actually lost by the investors as a direct result of Feno's conduct." (*Id.*, at p. 734.)

In contrast to *Feno*, it is abundantly clear on our record that appellant's conduct actually caused the losses to the Gomez investors, who invested their money with Gomez as a result of appellant's solicitation. Appellant's claim that the element of the lack of a permit must somehow be the proximate cause of the loss is not the appropriate test. ■ "A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' " (*People* v. *Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545].)

■ As noted by the court in *People* v. *Richards* (1976) *Id.*, 614 [131 Cal.Rptr. 537, 552 P.2d 97], a condition of probation must serve a purpose specified in Penal Code section 1203.1. (*Id.*, at p. 619.) "This requirement presents no problem for a court ordering a convicted defendant to make restitution to the victim for damages actually caused by the crime. Section 1203.1 expressly allows courts to impose reparation conditions 'for any injury done to any person resulting from such breach.' A closer question arises, however, when the court imposes a probationary condition requiring a defendant to pay a third party for losses not actually caused by the defendant's crime." (*Ibid.*) In *Richards,* the defendant was convicted of grand theft as to one victim and acquitted as to another victim; a condition of his probation was that he pay restitution to victim Ward, as to which count he was acquitted; the court held no hearing to determine facts other than those which led to defendant's acquittal. (*Id.*, at p. 624.) In reversing the restitution order, the court concluded that as the judge made no specific finding that defendant's behavior in the Ward transaction showed a dishonest state of mind comparable to that involved in the charge of which he was convicted, no rehabilitative purpose was served by the restitution. (*Id.*, at pp. 622-623.)

■ The instant case is one, according to *Richards,* which presents no problem for a court, because the victims' damages were actually caused by the crimes of which appellant was convicted. The fact that the offenses were strict liability offenses does not vitiate the fact that there is a direct relationship between the victims' losses and appellant's conduct. *Richards* does *not* stand for the proposition, impliedly asserted by appellant, that a rehabilitative purpose can be served only if there is some culpable state of mind

involved in the commission of the crime, a proposition which would result in the unavailability of restitution in any strict liability offense. In discussing the propriety of restitution for an offense of which the defendant is acquitted, the court noted that "unless the act for which the defendant is ordered to make restitution was committed with the same state of mind as the offense of which he was convicted, this salutary rehabilitative effect cannot take place." (17 Cal.3d at p. 622.)

Despite the fact that the offenses were strict liability offenses, the court in fact did find appellant to have a culpable state of mind even though the jury acquitted him of grand theft.[5] The trial court in this case was not imposing restitution based on mere civil claims, but on criminal acts and losses directly relating to the criminal acts of which appellant was convicted. Appellant also implies that it is somehow unfair that he was ordered to pay restitution, while Gomez, who was sentenced to prison for grand theft, does not have such an obligation. However, it is unclear from our record whether Gomez was being sued by the investors. ■ We also note that the fact that another party was involved in a crime does not preclude the court from requiring *full* restitution (see *People* v. *Goss* (1980) 109 Cal.App.3d 443, 460-461 [167 Cal.Rptr. 224]), and in any event, appellant was ordered to make restitution only as to 30 percent of the losses involved.

We conclude that appellant fails to show the court abused its discretion in ordering restitution as a condition of probation on the counts involving the "Gomez investors."

---

[5] The court stated in this regard that "[The jury] found not beyond a reasonable doubt. They didn't find these people innocent. . . . I listened to the evidence, and it's just, you know, it becomes grossly negligent that they kept in this business with their background and their knowledge, and I don't think they're as dumb as we're supposed to conclude. . . . It's unbelievable that they would not know that they had to register this type of operation of investments."

The court continued: "I wasn't impressed with the manner with which they testified during the case. There was a lot of arrogance I thought by the defendants, especially Baumgart as to the way he testified about him not knowing anything and both defendants are very intelligent. . . . [¶] And I'm just not convinced that they have seen the light as to the wrongness of the situation."

The court also found a direct cause and effect relationship between the crimes and the victims' losses: "I think that licensing or registration laws were meant to protect consumers . . . . [¶] . . . So to me there is a cause and effect that can be attributed to the violation of selling securities without permits because the scrutiny of the state would have precluded them from going into this type of activity had the state been able to oversee it. [¶] So, therefore, the consumers' loss would not have occurred. . . . [¶] So I feel restitution is called for on the securities violations alone without reference to grand theft."

## DISPOSITION

The judgment is affirmed.

Johnson, J., and Woods (Fred), J., concurred.