RAMBUS, INC., Plaintiff,

v.

INFINEON TECHNOLOGIES
AG, et al., Defendants.

No. CIV.A. 3:00CV524.

United States District Court,
E.D. Virginia,
Richmond Division.

July 13, 2004.

Michael W. Smith, Esquire, Craig T. Merritt, Esquire, R. Braxton Hill, Esquire,

Christian & Barton, L.L.P., Richmond, Gregory P. Stone, Esquire, Peter A. Detre, Esquire, Munger, Tolles & Olson LLP, Los Angeles, CA, for Plaintiff.

Brian C. Riopelle, Esquire, Robert M. Tyler, Esquire, McGuire Woods, LLP, Richmond, John M. Desmarais, Esquire, Gregory S. Arovas, Esquire, Michael P. Stadnick, Esquire, Kirkland & Ellis, New York City, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on two motions filed by Rambus, Inc. ("Rambus") seeking summary judgment against Infineon.[1] The motions are based on overlapping factual predicates; and, therefore, they will be considered in a single opinion. First, there is Rambus' Motion for Partial Summary Judgment on Infineon's Fifteenth Counterclaim—That Rambus' Conduct was "Fraudulent" in Violation of Cal. Bus. & Prof.Code Section 17200 (Docket No. 700). Second, there is Rambus' Motion for Summary Judgment on Infineon's Equitable Estoppel Defenses (Docket No. 704). For the reasons set forth below, Rambus' motions are denied.

There is significant overlap in the factual predicates for Infineon's equitable estoppel defense and its claim under Cal. Bus. & Prof.Code Section 17200 to the extent that that claim is based upon allegedly fraudulent conduct (the "Section 17200 claim").[2] And, Rambus' arguments for summary judgment on both the equitable estoppel defense and the Section 17200 claim are based, in the first instance, on a posited set of facts which, in reality, do not fairly depict either the equitable estoppel defense or the Section 17200 claim as Infineon actually presents them. Infineon's responsive briefs set forth the theory of, and the factual predicates for, its equitable estoppel defense and its Section 17200 claim in a much more limited way than Rambus has sought to cast them in an effort to have them controlled by the decision of the United States Court of Appeals for the Federal Circuit on Infineon's common law fraud claim. *Rambus, Inc. v. Infineon Tech. AG,* 318 F.3d 1081 (Fed. Cir.2003). The briefing and oral argument of these motions for summary judgment have served to confirm that Infineon's defense and claim are as set forth below, and it is incumbent on the Court to assess the motion for summary judgment against the factual context articulated by Infineon and not in the context which Rambus artificially has constructed, largely so that it can make the principal argument on which it seeks summary judgment.[3] Hence, the facts recited below are as posited by Infineon for its equitable estoppel defense and its Section 17200 claim. Of course, at this stage of the proceedings, Infineon is enti-

1. "Infineon" is the short form for the Defendants: Infineon Technologies AG, Infineon Technologies North America Corporation, and Infineon Technologies Holding North America, Inc.

2. Infineon's Section 17200 claim is comprised of three parts—unlawful conduct, unfair conduct, and fraudulent conduct—each of which is available under the California statute. *Rambus, Inc. v. Infineon Tech. AG,* 304 F.Supp.2d 812, 817 (E.D.Va.2004). The Rambus motion under consideration in this opinion is solely addressed to that portion of

the Section 17200 claim based on Rambus' allegedly "fraudulent" conduct.

3. Rambus is not entirely at fault in creating this problem, however, because Infineon did not fully excise from its Second Amended Answer and Counterclaims textual assertions which were rendered no longer relevant to this case by virtue of the decision of the Federal Circuit on Infineon's common law fraud claim. *Rambus, Inc. v. Infineon Tech. AG,* 304 F.Supp.2d 812, 828–29 (E.D.Va. 2004).

tled to the benefit of all reasonable inferences which can be drawn from the facts for which there is evidentiary support.

## STATEMENT OF FACTS[4]

Rambus was founded in March 1990. The founders were the two inventors named on United States Patent Application Serial No. 07/510,898 (the " '898 Application") which was filed in the United States Patent and Trademark Office ("PTO") on April 18, 1990. Also, in 1990 and 1991, Rambus filed Patent Cooperation Treaty ("PCT") and European patent applications that claim priority to, and have disclosures substantively identical to, the '898 Application.[5] The claims of the '898 Application and its PCT and European counterparts were directed to a type of dynamic random access memory architecture ("DRAM") designed by Rambus to which Rambus gave the sobriquet, "RDRAM."

Rambus is a technology company. In other words, it does not itself manufacture any tangible products. Rather, its assets and its products are the technology that it invents and licenses. That is what Rambus has called its "business model."

In the early 1990's, Rambus set out to license its proprietary, but, as of then, unpatented, RDRAM architecture to DRAM manufacturers including Infineon's predecessor Siemens Corporation.[6] Notwithstanding that Rambus had no patents for the RDRAM architecture, it fastened its business plans on licensing the technology outlined in the '898 Application. Thus, in the early 1990's, Rambus regularly met with DRAM manufacturers in an effort to license the technology in the '898 Application. Before those meetings, it was the practice of Rambus to execute nondisclosure agreements with the DRAM manufacturers and then to discuss fully its proprietary information, including the technology and architecture in the '898 Application. And, as part of those meetings, Rambus informed the DRAM manufacturers that its business model was to invent and license DRAM technology.

As explained by counsel for Rambus during the original trial of this action, once the nondisclosure agreements were signed (with approximately 60 companies in the DRAM industry), Rambus revealed documents and technical descriptions that supposedly contained everything that was in the '898 Application. Also, according to Rambus' counsel, the companies that asked to see the '898 Application were shown it. All of this was accomplished in Rambus' attempts to negotiate licenses with DRAM manufacturers in efforts to implement the Rambus business model.

In February 1990, Infineon and Rambus entered into discussions respecting a possible RDRAM license. As part of that pro-

---

4. The underlying facts of this litigation, as well as the posture of the case following a 2001 trial in this Court, an appeal to the Federal Circuit, *Rambus, Inc. v. Infineon Tech. AG*, 318 F.3d 1081 (Fed.Cir.2003), and a remand to this Court, have been set forth more fulsomely in prior recent opinions of the Court. *See, e.g., Rambus, Inc. v. Infineon Tech. AG*, 220 F.R.D. 264 (E.D.Va.2004); *Rambus, Inc. v. Infineon Tech. AG*, 304 F.Supp.2d 812 (E.D.Va.2004).

5. Rambus eventually abandoned the '898 Application, but it filed at least one continuation and several divisional applications in 1992 and, in subsequent years, Rambus filed numerous additional continuation and divisional applications, all of which share the common specification and claim the benefit of the '898 Application filing date.

6. Not long before this action was filed, Siemens Corporation spun off its semi-conductor business which is now conducted through the Infineon companies that are defendants in this action. Hence, Siemens Corporation will hereinafter be referred to as Infineon.

cess, Infineon executed a nondisclosure agreement and, thereafter, reviewed Rambus' RDRAM proprietary information.

Between 1990 and 1992, and again in 1994, Rambus representatives met with Infineon on several occasions in an attempt to convince Infineon to take a license to manufacture RDRAMs. During those meetings, Rambus explained the Rambus business model (inventing technology and licensing it). In these meetings, Rambus affirmatively represented to Infineon that Rambus considered itself the inventor of RDRAM, informed Infineon of the '898 Application, and advised that Rambus intended to obtain patents for RDRAM. During the same discussions, Rambus discussed the supposed advantages of the RDRAM architecture over other memory technologies, including the SDRAM[7] technology which, by virtue of exchanges of information that occurred during those meetings, Rambus knew that Infineon was then developing.

At the time that those negotiations were occurring in 1992 and 1994, both Rambus and Infineon were among the participants in an effort to develop a standard for the SDRAM at the Joint Electronics Devices Engineering Council ("JEDEC").[8] From its meetings with Infineon, as well as the JEDEC meetings, Rambus was aware that Infineon considered the SDRAM technology that was the subject of the JEDEC standard setting process to be open and not subject to the intellectual property rights of others if practiced within the constraints of the JEDEC standard.

At no time during the licensing discussions between Infineon and Rambus did Rambus inform Infineon that Rambus considered itself to have invented SDRAMs (or any other non-RDRAM memory architecture for that matter), nor did Rambus advise Infineon that it was seeking to obtain, or planned to enforce, any patents covering other memory architectures. Likewise, at no time during those discussions did Rambus advise Infineon that Rambus considered the SDRAM technology to use any of Rambus' technology.

By June 1992, however, at the latest, Rambus was of the view that SDRAMs infringed on some of its claims in the '898 Application and/or in the continuation and divisional applications that Rambus had filed in furtherance of the '898 Application. Further, Rambus then also intended to file additional claims that would cover features of SDRAMs made in compliance with the JEDEC standard. In particular, it was Rambus' plan to determine exactly what claims could be filed and then to file them, if possible, by the end of the third quarter of 1992. Also, as a part of the plan, Rambus intended to inform SDRAM manufacturers in the fourth quarter of 1992 of the claims that it had been able to file. This, Rambus thought, would enable it to secure more licenses with DRAM manufacturers.

To further its plan, Rambus officially became a JEDEC member in February 1992 and remained a JEDEC member until June 1996. Throughout that time, Rambus was fully aware that the goal of JEDEC was to develop "open" standards which, in sum, permit use of the standardized technology without the need for the payment of royalties or the risk of infringing any patents.

---

7. "SDRAM" is the acronym for Synchronous Dynamic Random Access Memory, one of the two specific DRAM technologies at issue in this suit. The other implicated technology is Double Data Rate–Synchronous Dynamic Random Access Memory, or "DDR–SDRAM."

8. JEDEC is a standard-setting organization of which Rambus was a member from 1992 to 1996. 318 F.3d at 1085. JEDEC's parent association is the Electronic Industries Association ("EIA"). *Id.* at 1085 n. 1 (discussing history of EIA and JEDEC).

There is evidence that, in furtherance of its plan, Rambus regularly attended JEDEC meetings, secured information about the SDRAM standard, and amended its divisional and continuation applications to cover the SDRAM architecture embodied in the contemplated JEDEC SDRAM standard. It was not at all unusual for Rambus' principal representative at JEDEC, Richard Crisp ("Crisp"), to email to Rambus executives and Rambus' outside patent lawyers information being discussed at the JEDEC meetings about the SDRAM standard. Nor was it unusual for Rambus' patent lawyers thereafter to draft new claims based on what had been observed at JEDEC. Meanwhile, Rambus continued its efforts to license RDRAM to DRAM manufacturers.

At one JEDEC meeting in May 1992, the chairman of the JEDEC committee, at the request of the Infineon representative, asked Crisp whether Rambus had any comment to make on certain intellectual property being discussed for inclusion in the SDRAM standard. Crisp shook his head in the negative. At the same meeting, a representative of another company commented to the group, of which Crisp was a member, that a review of the foreign counterpart to the '898 Application would not stand as an impediment to the SDRAM standard then under consideration. Crisp neither corrected nor contradicted this statement, notwithstanding that, at the time, Rambus considered the SDRAM architecture being developed at JEDEC to infringe its rights as defined under the '898 Application, as modified by divisional and continuation applications.

In early 1997, about six months after Rambus had withdrawn from JEDEC, Rambus and Infineon resumed RDRAM license negotiations; Infineon ultimately took a license for RDRAM that year. During the negotiations that preceded exe-

cution of the license, Infineon informed Rambus that it was planning to develop not only RDRAM products, but also to continue the efforts to design and make JEDEC compliant SDRAMs, at least in part because the JEDEC standards were open and nonproprietary. Indeed, Infineon began manufacturing JEDEC compliant SDRAMs in early 1997 while these discussions were underway. Infineon has proffered evidence that Rambus was aware of this fact.

At no time during the resumed 1997 RDRAM licensing discussions, however, did Rambus mention to Infineon that it had any intellectual property rights that would cover SDRAM or DDR–SDRAM and did not inform Infineon that it intended to enforce patents against the SDRAM technology then being made by Infineon. At that time, however, Rambus was of the view that Infineon's SDRAM products would infringe its intellectual property rights when they matured into patents. In fact, in July 1997, when the terms of the Rambus/Infineon RDRAM license were being finalized, the president of Rambus informed the chairman of Rambus' board of directors that Rambus had not yet informed Infineon that "we think SLDRAM and SDRAM–DDR infringe our patents."

After the license was executed, the parties continued their business relationship, during the course of which employees of Rambus met with, and regularly spoke to, Infineon's employees for the purpose of facilitating the manufacture by Infineon of RDRAMs under the license. During those discussions, Infineon continued to disclose that it was developing SDRAMs and DDR–SDRAMs and Infineon asserted its belief that those products were royalty free alternatives to the Rambus RDRAM, at least in part, when practiced in accordance with JEDEC standards. Notwithstanding its awareness of Infineon's plans

and of Infineon's view that Rambus' intellectual property rights did not reach the SDRAM or DDR–DRAM technologies, Rambus did not advise that, in its view, its intellectual property rights indeed covered those technologies.

Rambus conducted itself in a like fashion in its dealings with other DRAM manufacturers. For example, during a presentation in December 1992 to Hitachi Corporation ("Hitachi"), Rambus discussed three alternative DRAM technologies (RDRAM, SDRAM, and Ramlink) as part of the effort to convince Hitachi to purchase a license for RDRAM. During the presentation, Rambus listed negative points respecting Ramlink and SDRAMs in which Rambus stated that "Ramlink violated many Rambus patents." During that presentation, however, Rambus never advised that practicing the SDRAM standard would likewise run afoul of Rambus' intellectual property rights.

During a panel discussion with memory industry members in 1995, at about the same time that Rambus and Hyundai Electronics Industries Co., Ltd. ("Hyundai") were negotiating an RDRAM license, Hyundai expressed its preference for the SDRAM technology because, *inter alia,* it was an open technology while Rambus' RDRAM was a proprietary technology. Although Rambus responded to these statements with several technology-based rebuttals, Rambus made no mention that the SDRAM technology would be subject to a royalty payable to Rambus.

In another industry panel discussion in February 1997, various members of the DRAM industry and Rambus presented and discussed various DRAM alternatives. Rambus made a presentation on the RDRAM; NEC Corporation ("NEC")

made a presentation on a new SDRAM; and Samsung Electronics ("Samsung") made a presentation on the DDR–SDRAM. During that meeting Micron Corporation ("Micron"), another DRAM manufacturer, made quite clear that Micron and other manufacturers preferred technology that would be subject to open standards and thus not subject to royalties, rather than the RDRAM technology, which was royalty-bearing. Rambus, however, made no statement that either SDRAM or DDR–SDRAM were, or might be, subject to any intellectual property rights of Rambus.

Also, during its negotiations with DRAM manufacturers over RDRAM licenses, the president of Rambus, David Mooring, routinely presented a chart that compared RDRAM to SDRAM and to Synclink DRAM (which is different than SDRAM). That chart described RDRAM and Synclink DRAM (a Rambus-like architecture)—but not SDRAM—as subject to a royalty that would be due to Rambus.

It is on the foregoing factual allegations, each of which are supported by admissible evidence, that Infineon predicates its claim that Rambus acted to deceive Infineon and other DRAM manufacturers, and therefore is liable for fraudulent conduct under Section 17200. With the exception of the facts related to negotiations with other manufacturers, the same factual allegations constitute the factual predicate for Infineon's equitable estoppel defenses. With these facts in mind and considering the equitable estoppel defense and the Section 17200 claim as framed by Infineon, it is appropriate to discuss first the motion for summary judgment on the Section 17200 claim and then the equitable estoppel defenses.[9]

---

9. Rambus' equitable estoppel motion is directed to three affirmative defenses which Rambus characterizes as "equitable estoppel." Infineon's fourth affirmative defense in its Second Amended Answer and Counterclaims mentions the word "estoppel" which

## DISCUSSION

### I. The Standard for Summary Judgment

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,'" that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, that party must set forth "specific facts showing that there is a genuine issue for trial." *Id.* at 587, 106 S.Ct. 1348. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.* at 587, 106 S.Ct. 1348; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

### II. Rambus' Motion for Summary Judgment on Infineon's Section 17200 (Fraudulent) Claim

The California Unfair Competition statute provides in pertinent part:

> [U]nfair competition shall mean and include *any unlawful, unfair or fraudulent business act or practice* ....

Cal. Bus. & Prof.Code § 17200 (emphasis added). As construed by the Supreme Court of California, the scope of the unfair competition law is quite broad. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal. Rptr.2d 548, 973 P.2d 527, 539 (1999). The statute's "coverage is sweeping, embracing anything that can properly be called a business practice." *Id.* (citing *inter alia, Rubin v. Green*, 4 Cal.4th 1187, 17 Cal. Rptr.2d 828, 847 P.2d 1044, 1052 (1993)).

Where the alleged violation of Section 17200 is based on the allegation that a business act or practice is fraudulent, the focal issue is whether the alleged act or

---

appears to be an estoppel of an equitable nature. Infineon's ninth affirmative defense explicitly articulates equitable estoppel. The tenth affirmative defense is a contention that, by virtue of equitable estoppel, Infineon has an "implied license" to practice the patents-in-suit. Those three defenses appear to be more or less co-extensive and are properly addressed together.

practice was likely to cause members of the consuming public to be deceived. *Committee on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660, 668 (1983); *Kunert v. Mission Fin. Serv. Corp.*, 110 Cal.App.4th 242, 1 Cal.Rptr.3d 589, 606 (2003); *Prata v. Superior Court*, 91 Cal. App.4th 1128, 111 Cal.Rtpr.2d 296, 307 (2001). Thus, the controlling test "is whether the public is likely to be deceived [by the alleged business act or practice]." *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 85 Cal. Rptr.2d 301, 317 (1999) (internal quotations and citations omitted). Here, the consuming public is made up of DRAM manufacturers and competitors, the potential consumers for Rambus' alleged intellectual property rights, if any, in the technologies at issue. *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503, 514 (1985) (noting that Section 17200 "is intended to protect consumers as well as business competitors").

█ Over a period of almost ten years, when negotiating with DRAM manufacturers and in public fora with industry members, Rambus and the DRAM manufacturers discussed various DRAM architectures, including RDRAM, SDRAM, and DDR–SDRAM. In those situations, Rambus laid claim to the inventorship and ownership of RDRAM technology and declared its intention to patent that architecture, often disclosing its initial 1990 patent application. Also, Rambus described itself as a technology company, whose business was to license technology that it had invented. On the basis of these affirmative statements, it was reasonable for the DRAM manufacturers to conclude that, if Rambus had invented SDRAM or DDR–SDRAM, it likewise would have said so and would have sought to license those

technologies, just as it did with the patent-pending RDRAM architecture.

Under the circumstances of those negotiations and discussions, the assertion of a claim of inventorship and ownership of one technology, and the absence of such an assertion as to the other technologies under discussion, reasonably could be construed to mean that Rambus (which billed itself as a company that licensed the technology that it invented) had no rights to the technology as to which it asserted no rights. Thus, the affirmative statements made by Rambus were capable of deceiving.

Moreover, not once during those public and private sessions did Rambus ever claim inventorship, ownership, or rights over non-RDRAM technologies, nor did it express any intent to patent the SDRAM or DDR–SDRAM technologies that were discussed, in Rambus' presence, as open and not subject to any intellectual property rights. Not once did Rambus ever disapprise any DRAM manufacturer of the manufacturer's view—stated in Rambus' presence—that the SDRAM and DDR–SDRAM technologies were open and not subject to royalties. When a DRAM manufacturer, such as Infineon, disclosed its plan to build and sell SDRAM or DDR–SDRAM architecture, not once did Rambus alert the manufacturers of its secretly maintained view that, when built and sold, that architecture would fall within the reach of a Rambus invention or a Rambus intellectual property right, rights on which Rambus was even then trying to improve its position. It is reasonable of a manufacturer who, during a business relationship that involves fulsome discussions about alternate technologies, discloses plans to embark on an obviously expensive new venture (making and marketing a new product) to expect the person to whom the disclosure is made to protest or, at least,

to lay claim, to an intellectual property right that will be infringed by those plans. That is particularly so where, as here, Rambus (a) had freely and vigorously laid claim to the inventorship and ownership of a similar kind of technology in the same field; and (b) had openly made known that its corporate life's blood came from licensing technology that it had invented.

Thus, on the record taken as a whole and giving Infineon the benefit of the inferences that permissibly may be drawn from the record, Infineon has demonstrated a triable issue of fact respecting whether Rambus' affirmative statements, as well as its conduct and its inaction, were reasonably likely to have deceived DRAM manufacturers, including Infineon. That conclusion is underscored by evidence from which the finder of the fact could conclude that the deception (if the facts are found to constitute deceptive conduct) was intentional.

■ Of course, intent is not necessary to a fraudulent prong Section 17200 claim. *People ex rel. Van de Kamp v. Cappuccio, Inc.*, 204 Cal.App.3d 750, 251 Cal.Rptr. 657, 664 (1988); *see generally* James Wheaton, *California Business & Professional Code Section 17200: The Biggest Hammer*, 16 J. Envtl. L. & Litig. 421, 428–29 (2001). However, the evidence of intent to deceive is probative of the issue whether the asserted conduct reasonably likely could have deceived. First, if conduct is intended to deceive, that is probative evidence that the conduct, in actuality, is reasonably likely to deceive because a deceiver is unlikely to engage in conduct in pursuit of deceit if that conduct is not thought by the deceiver likely to achieve its objective. Second, evidence of intentional deception is probative, as well, of whether the allegedly deceptive conduct is substantively deceptive.

Rambus' motion for summary judgment is somewhat unusual in that Rambus does not assert that the facts, as articulated by Infineon, fail to make out a triable issue on the Section 17200 claim. Rather, Rambus asserts that the Section 17200 claim fails as a matter of law because it is based entirely on nondisclosures as to which there is no affirmative duty to disclose. Rambus' arguments fail for three reasons.

First, as mentioned in the introduction, the facts on which Rambus makes its argument mischaracterize how Infineon posits its Section 17200 claim. In particular, Rambus describes Infineon's claim as one exclusively based on nondisclosure. That simply is not the case. In support of its claim, Infineon has offered proof of affirmative statements, as well as inaction and silence under circumstances where inaction and silence are reasonably likely to deceive. Thus, Rambus' motion fails because it simply does not address the claim as presented by Infineon.

Second and relatedly, Rambus asserts that Infineon's Section 17200 claim depends upon the existence of a disclosure duty and that, because there is no cognizable disclosure duty that Rambus breached, the claim fails as a matter of law. Again, Rambus misperceives Infineon's claim as Infineon asserts it. Moreover, Rambus, in its attempt to liken Infineon's Section 17200 fraudulent claim to the now discredited common law fraud claim, misperceives California law. *See Bank of the W. v. Superior Court*, 2 Cal.4th 1254, 10 Cal. Rptr.2d 538, 833 P.2d 545, 553 (1992) ("In drafting the act, the Legislature deliberately traded the attributes of tort law for speed and administrative simplicity. As a result, to state a claim under the act one need not plead and prove the elements of a tort. Instead, one need only show that members of the public are likely to be deceived.") (internal citations and quota-

tions omitted); *Wang v. Massey Chevrolet*, 97 Cal.App.4th 856, 118 Cal.Rptr.2d 770, 780 (2002) ("[T]he term 'fraudulent' as used in Section 17200 does not refer to the common law tort of fraud but only requires a showing [that] members of the public are likely to be deceived.").  ·

Infineon's assertion is that there is a duty under Section 17200 not to engage in conduct that is likely to deceive the consuming public and, according to Infineon, that is the duty that was breached by the conduct, as well as the inaction and silence, in which Rambus is alleged to have engaged. It is that duty which the California courts have found to be the touchstone of a Section 17200 claim.

For example, in *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144, 93 Cal.Rptr.2d 439 (2000), the court held that liability under the California statute did not depend upon an independent duty to disclose but instead turned on whether the defendant violated the duty to refrain from engaging in conduct that was likely to cause deception in the consuming public. In that case, the plaintiff, Peter Schnall ("Schnall"),[10] rented a vehicle from the defendant, the Hertz Corporation ("Hertz"). At the commencement of the rental, Hertz, as was its policy, delivered to Schnall a vehicle containing an adequately filled tank of gas.

The rental agreement with Hertz, however, required Schnall to choose, at the inception of the rental, between two fuel options. *Schnall*, 93 Cal.Rptr.2d at 444. The first option, chosen by Schnall, was to not purchase fuel from Hertz at the commencement of the rental. If a renter selected this option and returned, at the termination of the rental, the vehicle with less fuel than when it was delivered, Hertz imposed a "fuel service charge." *Id.* If, however, a customer who selected this option returned the car to Hertz with a tank as full as when it was delivered, Hertz imposed no fuel service charge. The rental contract did not disclose the amount charged in conjunction with the fuel service fee; rather, the contract stated that the price for refueling was based on a "per mile" or "per gallon" rate. *Schnall*, 93 Cal.Rptr.2d at 444.[11]

What the rental contract failed to disclose, however, was that this refueling rate ultimately resulted in the customer paying gas prices at almost three times the average gas station price. In other words, when Schnall ultimately returned his rental car with less than a full tank, only then did he learn the actual cost of Hertz's refueling fee. Schnall, on behalf of himself and a class of Hertz renters, brought suit in California court alleging, *inter alia*, that Hertz had engaged in a "fraudulent" business practice within the meaning of Section 17200.

The trial court sustained Hertz's demurrer to the plaintiff's Section 17200 fraudulent case. The appellate court, however, reversed this finding. The court noted that a question of fact existed respecting whether a reasonable customer would have

---

10. Schnall was the named plaintiff in a class action suit.

11. The second option, which, of course, was not chosen by Schnall or the other members of his class, permitted renters to pay for the tank of gas that they received from Hertz at the inception of the rental. If the renter selected this option, no additional fuel charge was imposed upon the car's return; the renter, however, did not receive credit for any fuel left in the tank at the time of return. *Schnall*, 93 Cal.Rptr.2d at 444. Importantly, the cost for fuel in this second option was at a more reasonable price than that under the fuel service charge. In other words, Hertz only imposed the exorbitant fuel service charge on those customers who chose the first option and thereafter failed to return the car with an adequately full tank.

been deceived by the defendant's conduct. Contrary, however, to Rambus' urged construction of the California statute, the court did not look for the existence of an independent source of a duty to disclose in discussing the Section 17200 fraudulent case. In other words, the case did not turn on whether Hertz had a duty to disclose the actual fuel prices to customers—the court did not look to the law of contracts, fiduciary relationships, or otherwise to find one. Nor did the court examine the relationship of Schnall to Hertz and what type of duties or obligations any such relationship may have implicated.

Rather than utilizing those concepts, which, of course, are quite familiar in common law fraud actions, the court examined whether Hertz's conduct was reasonably likely to cause deception in the consuming public. *Schnall*, 93 Cal.Rptr.2d at 458. And, because the court found questions of fact respecting that issue, it reversed the trial court's demurrer. *Id.; see also Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 119 Cal.Rptr.2d 190 (2002). Thus, as shown by *Schnall*, Section 17200's fraudulent prong, rather than requiring reference to an independent source of duty or obligation, itself imposes a duty on businesses operating in California: a duty to not take actions reasonably likely to deceive the consuming public.

Nonetheless, citing *Searle v. Wyndham Int'l, Inc.*, 102 Cal.App.4th 1327, 126 Cal. Rptr.2d 231 (2002), Rambus maintains that a Section 17200 fraudulent claim requires the plaintiff to point to the breach of an independent duty. In *Searle*, the California intermediate court of appeals reviewed a case involving a plaintiff's allegations that a hotel had engaged in "fraudulent" business practice under Section 17200 by not expressly advising patrons that the 17% service charge it added to its room service bills was paid directly to the server. The plaintiff complained that, by failing to disclose the ultimate repository of this payment, the hotel deceived guests into leaving an additional tip for the servers. The court, however, found that the hotel's billing methods did not interfere with patrons' reasonable expectations with respect to the custom of tipping. *Searle*, 126 Cal.Rptr.2d at 237.

Although, in discussing the Section 17200 claim, the court employed some tort-sounding language in rejecting the plaintiff's claim,[12] Rambus' contention that the court rejected the claim *because* the plaintiff failed to point to an independent source from which a duty to disclose could have arisen is erroneous. To the contrary, the court explained that, considering the customs and mores of tipping, the hotel's conduct simply was not reasonably likely to cause members of the consuming public to be deceived. *Searle*, 126 Cal.Rptr.2d at 237 ("In sum, in failing to advice its guests as to how it compensates its employees, the hotel is not guilty of any deceit."). In other words, although the court employed some tort-like language in its opinion, it did not dismiss the plaintiff's claim for failing to establish an independent source of disclosure duty, but rather because, in light of the social customs and expectations surrounding the practice of tipping, the hotel's actions simply were not likely to deceive the consuming public, that is, the hotel's practice was not "fraudulent" as Section 17200 uses the term. That, of course, is consistent with the rationale upon which *Schall* and *Mass. Mut. Life Ins. Co.* were decided, as well as the Supreme Court of California's general inter-

---

12. For instance, the court used the term "obligation" and the phrase "right to know." *Searle,* 126 Cal.Rptr.2d at 237.

pretation of the fraudulent prong of Section 17200. *Bank of the W.*, 10 Cal. Rptr.2d 538, 833 P.2d at 553 ("In drafting the act, the Legislature deliberately traded the attributes of tort law for speed and administrative simplicity. As a result, to state a claim under the act one need not plead and prove the elements of a tort. Instead, one need only show that members of the public are likely to be deceived.") (internal citations and quotations omitted).

Finally, Rambus' argument is predicated on the erroneous assumption that the Section 17200 claim is foreclosed by the Federal Circuit's opinion setting aside the judgment on Infineon's common law fraud claim. The Federal Circuit's decision on Infineon's common law claim held that Rambus did not breach a duty to disclose information under the EIA/JEDEC patent disclosure policy. *Rambus, Inc.*, 318 F.3d at 1105. In other words, the Federal Circuit's decision addressed whether Infineon had put on evidence sufficient to prove the first element of a fraud claim under Virginia common law: whether there was a breach of the duty to disclose. Nothing in that opinion addressed whether Rambus' conduct as a whole over the ten year period in its dealings with the DRAM manufacturers was likely to have deceived the DRAM manufacturers. *Rambus, Inc.*, 304 F.Supp.2d at 822.

Rambus makes much of the fact that a part of Infineon's Section 17200 claim is supported by evidence respecting what Rambus did, and did not do, at JEDEC meetings. In particular, as it did in its common law fraud claim, Infineon cites evidence that Crisp shook his head no in response to a question whether he wished to comment upon a pending matter concerning the SDRAM standard at JEDEC and that Crisp remained silent in the face of the statement made by a representative

of NEC regarding whether the foreign counterpart of the '898 Application created no problem to the SDRAM standard being considered by JEDEC. Quite clearly, the Federal Circuit's decision forecloses any assertion that Crisp's conduct violated the EIA/JEDEC disclosure policy. But, that does not mean that the evidence is of no probative value in determining whether what was done, or not done, when considered along with Rambus' other conduct, was likely to have deceived the manufacturers about Rambus' views of its intellectual property rights.

In reality, the argument that Rambus makes is premised on the unarticulated notion that a specific piece of evidence can be considered probative only on one issue. Clearly, that is not the law. The evidence of Crisp's actions and inactions while attending JEDEC meetings can be considered, along with other evidence of Rambus' statements, conduct, and inaction, in assessing whether DRAM manufacturers, including Infineon, were reasonably likely to have been deceived, as envisioned by the California law, by the entire course of conduct in which Rambus engaged over an eight to ten year period, notwithstanding that Crisp's actions and inaction did not breach the EIA/JEDEC patent disclosure policy.

Finally, Rambus argues that, in relying on discussions pertaining to the 1997 RDRAM license agreement between Rambus and Infineon, Infineon is seeking to convert a contractual relationship into a fiduciary relationship. The argument mischaracterizes what Infineon has to say respecting how the circumstances surrounding the 1997 RDRAM licensing agreement negotiations are a part of the context for the deceit which is at issue in the Section 17200 claim.[13] In light of this mischaracterization, Rambus' argument fails.

---

**13.** Indeed, Infineon is not claiming that the

1997 RDRAM license agreement creates a

In summary, Infineon has raised a triable issue of fact respecting whether Rambus' entire course of conduct throughout the 1990s was reasonably likely to have caused members of the DRAM consuming public to have been deceived. Rambus' motion for partial summary judgment on Infineon's Section 17200 claim, therefore, will be denied.

## III. Rambus' Motion for Summary Judgment on Infineon's Equitable Estoppel Defense

This motion for summary judgment suffers from some of the same conceptual defects that appear in Rambus' motion for summary judgment on Infineon's Section 17200 claim. In particular, here too Rambus constructs its motion to address a strawman claim that is not the theory actually posited by Infineon's defense.

The factual assertions on which Infineon bases its defense of equitable estoppel are the same as the factual predicate recited above for its Section 17200 fraudulent claim except that, in asserting the equitable estoppel defense, Infineon does not rely on the communications that Rambus had with other DRAM manufacturers, either privately or in various industry meetings. It is Infineon's theory that the course of conduct in which Rambus engaged throughout the 1990s call into play an equitable estoppel defense because Rambus' communications (statements, conduct, inaction, and silence) misled Infineon into believing that Rambus had no intellectual property rights that it would assert to keep Infineon from practicing the open SDRAM and DDR–SDRAM standards created at JEDEC.

fiduciary duty, nor could it in perspective of the Federal Circuit's decision. 318 F.3d at 1096 n. 7.

**14.** In *Aukerman,* the Federal Circuit also sorted out the difference between the equitable

## A. The Equitable Estoppel Defense Presents Triable Issues

In *A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020 (Fed.Cir.1992) (hereinafter *"Aukerman"*), the Federal Circuit articulated the general principles of the defense known as "equitable estoppel." *Id.* at 1041.[14] Citing E.B. Dobbs, *Handbook on the Law of Remedies,* § 2.3, at 42 (1973), the Federal Circuit articulated the following statement as a reasonable and fairly complete distillation of the underlying factual elements of equitable estoppel from the case law:

> An [equitable] estoppel case ... has three important elements. [1] The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. [2] The other relies on that communication. [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*Aukerman,* 960 F.2d at 1041; *see generally* 6 Donald S. Chisum, *Chisum on Patents: A Treatise on the Law of Patentability, Validity and Infringement* § 19.05[3] (2002).

Here, Infineon asserts and has proffered sufficient evidence to support a finding that, over the course of ten years, in direct dealings with Infineon and also at JEDEC meetings, Rambus (the actor) which had knowledge of the true facts respecting its intellectual property rights, including patent rights and patent applica-

defense of laches and the defense of equitable estoppel. For purposes of this discussion, it is unnecessary to consider that aspect of the decision in *Aukerman.*

tions, as well as its intentions as to the enforcement thereof, made misleading communications by words, conduct, and silence, on which Infineon reasonably relied, and that Infineon would be harmed materially if Rambus is now permitted to assert any claim inconsistent with its earlier conduct. Also, citing *Aukerman*, Infineon correctly points out that equitable estoppel can be based on misleading inaction if coupled with other factors respecting the relationship or contacts between the parties.

On this record, and considering the defense as Infineon posits it (rather than as Rambus describes it), Infineon has met its burden to show a triable issue of fact on the defense of equitable estoppel as outlined in *Aukerman*. Infineon has offered evidence from which the finder of the fact could conclude that Rambus (the actor) knew the true state of affairs respecting its understanding of its intellectual property rights in SDRAM and DDR–SDRAM, its interpretation of the '898 Application as modified in continuation and divisional applications, and its intent to secure patents that would cover those technologies. According to the evidence offered by Infineon, the true state of affairs was that, from at least 1992 until 2000, Rambus thought that its intellectual property rights as described in the '898 Application as subsequently modified by continuation and divisional applications, covered the SDRAM architecture and later the DDR–SDRAM architecture as that technology was being standardized at JEDEC.

Infineon has offered evidence from which the trier of fact could conclude that from, at least, 1992 through 1997 (and perhaps further) Rambus communicated to DRAM manufacturers in a misleading way by its statements, conduct, and inaction that Rambus' intellectual property rights in, and deriving from, the '898 Application did not cover the SDRAM and DDR–SDRAM architecture as it was being standardized at JEDEC. The discussion in Discussion Section II, respecting evidence of deceiving conduct is equally applicable here, but, in the interest of brevity, will be adopted and not repeated. Also, Infineon has offered evidence from which the finder of the fact could conclude that Infineon reasonably relied on those misleading communications. Finally, Infineon has offered evidence from which the finder of fact could conclude that Infineon would be materially harmed if Rambus now is permitted to assert any claim inconsistent with its earlier conduct and inaction. Thus, as to the equitable estoppel defense as outlined in *Aukerman*, Infineon has demonstrated a triable issue of fact.[15]

The principal argument advanced by Rambus in support of its motion for summary judgment is that Infineon's equitable estoppel defense is foreclosed by the decision of the Federal Circuit on Infineon's common law fraud claim. The premise of that argument is that "[i]t is the law of this case that Infineon has failed to prove the first element of both the fraud and the equitable estoppel tests." Pls. Mem. in Supp. of Mot. for Summ. J. on Def.'s Equitable Estoppel Defs., May 17, 2004, at 8. That argument fails for several reasons.

First, the Federal Circuit made no decision addressing equitable estoppel, either directly or by implication. Instead, the Federal Circuit held that, although there

---

**15.** Of course, there are other inferences that can be drawn from the facts offered by Infineon, but it is not proper to make factual judgments of that sort at this stage of the proceedings. Further, it is appropriate to note that Rambus' summary judgment motion is not predicated on the alleged absence of proof respecting the reliance and prejudice factors of the *Aukerman* test.

was an EIA/JEDEC disclosure policy which imposed a duty to disclose patents and patent applications under certain circumstances, Infineon had not proved that Rambus violated that duty. *Rambus, Inc.,* 318 F.3d at 1105. The Federal Circuit's decision may be searched in vain for any comment about equitable estoppel because that issue was simply never before the court. Nor, is it correct that the alleged breach of the JEDEC duty to disclose the existence of certain patents or patent applications is the same as the theory of equitable estoppel, as Infineon has posited that theory.

Infineon's theory of equitable estoppel is simple. It is that from 1990 to 2000 Rambus made statements and engaged in a course of conduct and inaction that misled Infineon into believing that Rambus had no intellectual property rights or patents that covered the SDRAM architecture and the DDR–SDRAM architecture as they were being developed into JEDEC standards and as used by Infineon in making the accused products. It is true that, as part of the context of this broad course of conduct, Infineon, in a rather limited fashion, relies on certain Rambus conduct and inaction that occurred at JEDEC. That, however, is a far cry from saying that the equitable estoppel defense is the same as the common law fraud claim that was rejected for failure of proof in the Federal Circuit's decision.

Moreover, it is disingenuous of Rambus even to make the argument it now makes because of the position it took following the first trial. Specifically, after the first trial, Infineon filed a motion asking this Court to decide the defense of equitable estoppel. Rambus opposed that motion, and, at Rambus' urging, the Court declined then to decide the defense of equitable estoppel. Under those circumstances, it is unjustifiable for Rambus to be making

the argument that it now makes. Indeed, at the time, Rambus knew full well that, if the claim construction opinion was reversed, equitable estoppel once again would be presented as a defense to infringement. Rambus will not now be heard to complain that it is not possible for Infineon to present that defense.

Finally, as was the case in respect of its motion for summary judgment on Infineon's Section 17200 claim, the unarticulated premise of Rambus' motion is that evidence may have probative effect only with respect to one claim or one issue. That simply is not the case.

To the limited extent that Infineon relies on evidence respecting the conduct and inaction of Rambus at JEDEC, that evidence has probative effect respecting the other conduct which Infineon alleges that has nothing to do with the conduct or inaction of Rambus at JEDEC. That is because the evidence respecting the conduct and inaction at JEDEC gives context to, and provides support for, the evidence of the statements, conduct, and inaction that did not occur at JEDEC. Taken together, all the evidence is probative of the course of conduct of which Rambus is alleged to have engaged in over a ten year period from 1990 to 2000. For the foregoing reasons, Infineon has raised a triable issue of fact respecting the first element of the defense of equitable estoppel and that defense is not barred by the decision of the Federal Circuit on the first element of Infineon's common law fraud claim.

## B. The Equitable Estoppel Defense is Available

■ Rambus also asserts that the rule of *Aukerman* simply does not apply to the facts of this case because Infineon cannot prove that it "had knowledge of the patentee and its patent," which, according to Rambus, is a critical element of an equita-

ble estoppel defense. Pls. Mem. in Supp. of Mot. for Summ. J. on Def.'s Equitable Estoppel Defs., May 17, 2004, at 12 (citing *Winbond Electronics Corp. v. Int'l Trade Comm'n,* 262 F.3d 1363, 1374 (Fed.Cir. 2001)). That theory is based on the reality that, in most patent cases, the issue of equitable estoppel arises when a patent holder is "the actor" referred to in the Federal Circuit's formulation of the equitable estoppel defense in *Aukerman.* For the reasons that follow, Rambus' argument lacks merit.

To assess Rambus' argument, it is necessary first to understand *Aukerman.* When it decided *Aukerman,* the Federal Circuit first articulated the equitable estoppel defense in general terms. Then, it applied those general terms to the specific facts of the patent case before it. In *Aukerman,* the equitable estoppel defense was asserted against the holder of an issued patent, *i.e.,* a "patentee." Thus, quite naturally, when it applied the general elements of equitable estoppel to the facts before it, the Federal Circuit spoke in terms of a patentee and an alleged infringer. For example, when discussing the first element of equitable estoppel—that "[1] the actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence," *Aukerman,* 960 F.2d at 1041, the Federal Circuit made the following observations as the rule of the case:

> The first element of equitable estoppel concerns the statements and conduct of the patentee which must "communicate something in a misleading way." The "something" with which this case, as well as the vast majority of equitable estoppel cases in the patent field is concerned, is that the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged.

*Id.* at 1042. In like fashion, the rest of the case discusses the basic elements of equitable estoppel in terms of the facts of *Aukerman* which involved a patentee which had made certain statements to an accused infringer. And, as might be expected, ensuing decisions, involving similar fact patterns, followed suit. For example, in *ABB Robotics, Inc. v. GMFanuc Robotics Corp.,* 52 F.3d 1062 (Fed.Cir.1995), the Federal Circuit articulated the three elements of equitable estoppel as:

> The first is that the patentee, through misleading conduct leads the alleged infringer to reasonably infer that he does not intend to enforce the patent against the accused infringer.... The second element is that the alleged infringer relies on the patentee's conduct. The final element is that due to the reliance, the alleged infringer will be materially prejudiced if the patentee is permitted to proceed with his infringement suit.

*ABB Robotics, Inc.,* 52 F.3d at 1063; *see also Scholle Corp. v. Blackhawk Molding Co., Inc.,* 133 F.3d, 1469, 1471 (Fed.Cir. 1998).

Fastening on those case-specific articulations of the test for equitable estoppel, Rambus argues that, at the time it is alleged to have engaged in misleading conduct, it did not have the patents-in-suit and that, therefore, equitable estoppel is not available to Infineon as a defense. When examining that assertion, the Court, through its independent research, located the unpublished decision in *Ricoh Co., Ltd. v. Nashua Corp.,* 185 F.3d 884, 1999 WL 88969 (Fed.Cir.1999) (hereinafter "*Ricoh*"), which involved the defense of equitable estoppel against a patent holder which, at the time of the allegedly misleading statements, did not have an issued patent. In deciding the case, the Federal Circuit applied the *Aukerman* test and, in

commenting about an estoppel based on misleading inaction, the court noted:

> However, Nashua [the alleged infringer] fails to apprehend the difference between inaction in light of an issued patent, as was the case in *Scholle,* and inaction in light of a pending patent application, as is the case here.... When Nashua disclosed to Ricoh the redesigned cartridge in June 1987, the '603 patent had not issued. Until September 1989, when the '603 patent did issue, Ricoh had no right to Nashua's design and cannot now be estopped for failing to speak up.

*Ricoh Co., Ltd.,* 185 F.3d 884, 1999 WL 88969, at *4 (citing *Aukerman,* 960 F.2d at 1042). That terse language, however, offered no real explanation for why the defense of equitable estoppel, as articulated by *Aukerman,* is available only to cases where there is an issued patent. Moreover, the decision in *Ricoh* is facially at odds with the articulation of the general principles of equitable estoppel articulated by the en banc court in *Aukerman.* Finally, in a footnote, the court in *Ricoh* commented that "we express no opinion on the situation where a patentee makes an affirmative misrepresentation regarding a pending application and the possibility that under such circumstances an estoppel may arise precluding enforcement of any subsequently issued patent." *Ricoh,* 185 F.3d 884, 1999 WL 88969, at *4 n. 4.

In the original briefing on this motion, neither party had cited *Ricoh.* For that reason, and because of the lack of rationale for the holding in *Ricoh,* the apparent conflict between *Ricoh* and the en banc decision in *Aukerman* outlining the general nature of an equitable estoppel defense, and because of the footnote reservation in *Ricoh* (which might have application in this case, at least as Infineon sees it), the Court called for further briefing on the issues.

In its brief, Rambus takes the position that, because *Aukerman* and cases decided thereafter which address the equitable estoppel defense speak in terms of a patentee, an issued patent, and an alleged infringer, that those circumstances must be present in every case before the defense of equitable estoppel can apply. Rambus further argues that *Ricoh* makes this apparent. That contention has superficial appeal but, for the following reasons, it is in error.

First, in *Aukerman,* the Federal Circuit, recognizing the extensive common law lineage of the equitable estoppel defense, articulated the defense of equitable estoppel in general terms before ever applying it to the specific facts of that case. From that and the manner in which the defense was explained generally, it is obvious that the defense has application beyond the specific facts presented by *Aukerman.* That, of course, is fully consistent with the fact that equitable estoppel is a venerable doctrine that "is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *Aukerman,* 960 F.2d at 1041; *see generally United States for Use and Benefit of Humble Oil & Ref. Co. v. Fid. & Cas. Co. of N.Y.,* 402 F.2d 893, 897 (4th Cir.1968) (describing equitable estoppel as "well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another"); *see also Dawkins v. Witt,* 318 F.3d 606, 611 n. 6 (4th Cir.2003); *Gladden v. Pargas, Inc. of Waldorf, Md.,* 575 F.2d 1091, 1094 (4th Cir.1978).

Second, there is nothing in the text of *Aukerman* that suggests that the Federal Circuit intended to cabin the defense of equitable estoppel to the precise facts of the *Aukerman* case or, for that matter, to

preclude its application in circumstances in which the allegedly misleading conduct occurred before a patent was issued but while it was pending. To the contrary, the initial background discussion in *Aukerman* suggests exactly the opposite conclusion. *See Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co.*, 275 F.Supp.2d 850, 862 (E.D.Mich. 2003).

Third, the Federal Circuit, both before and after *Aukerman,* has applied the equitable estoppel defense in circumstances in which there was not an issued patent at the time of the misleading communication. One of those decisions, *MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568 (Fed. Cir.1989), is actually cited in a footnote in *Aukerman.*[16] That footnote is at the end of a sentence in which the *Aukerman* court had just discussed the first element of equitable estoppel and, in so doing, had explained that "something" must be communicated in a misleading way. In that discussion, the Federal Circuit noted: "The 'something' with which this case, as well as the vast majority of equitable estoppel cases in the patent field is concerned, is that the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged." *Aukerman,* 960 F.2d at 1042. Immediately following that sentence, the court dropped the footnote citing *MCV, Inc.* It preceded the citation with the notation *"but see"* and then cited the case in which the equitable estoppel defense did not involve an issued patent. Thus, it seems rather clear that, when it decided *Aukerman,* the Federal Circuit was quite aware that the defense of equitable estoppel was not confined to the circumstance in which the defense was presented in "the vast majority" of cases in the patent field. And, if there were any doubt about that proposition, it was dispelled when, in *Wang Laboratories, Inc. v. Mitsubishi Electric Corp.*, 103 F.3d 1571 (Fed.Cir.1997), the Federal Circuit applied the doctrine of equitable estoppel to find that an alleged infringer had an implied license by virtue of the entire course of conduct between the plaintiff and the alleged infringer which took place before the patent-in-suit had issued.[17]

Finally, there is no logical reason why the doctrine of equitable estoppel should not apply where, as is alleged here, there is evidence that the owner of intellectual property (the actor) made misleading statements and engaged in misleading inaction about a pending patent application which, at the time, the owner actually disclosed and believed to cover a technology in addition to that which it is telling proposed licensees is covered by its patent application. The mere fact that, at the time of the misleading communication (whether by conduct or inaction), a patent has not been issued should not permit the actor, upon the defendant's proof of the other elements of equitable estoppel, to escape the consequences of its misleading communications after the patent has in fact been issued. That is especially true where, as here, there is evidence that the actor actually believed that the pending application covered technology in addition to that to which it was laying claims of inventorship and intellectual property rights during its negotiations with others, and, where, as here, the actor was pursu-

---

16. *Aukerman,* 960 F.2d at 1042 n. 17.

17. To be sure, the court in *Wang* was not presented directly with an *Aukerman*-type equitable estoppel claim. Rather, the *Wang* case involved an implied license that was merely "in the nature" of an equitable estop-

pel. *Wang,* 103 F.3d at 1582. That being said, the *Wang* court certainly discussed and relied upon the *Aukerman* line of cases in finding the patent-holder's patents unenforceable against the purported infringer.

ing continuation and divisional applications designed to insure that its patents would cover that additional technology.

Indeed, the rule for which Rambus argues would impose a constraint on the defense of equitable estoppel that is inconsistent with the way that the defense was articulated by the Federal Circuit in *Aukerman* and that is contrary to the premise of *Aukerman* that the defense of equitable estoppel "is not limited to a particular factual situation nor subject to resolution by simple or hard and fact rules." *Aukerman,* 960 F.2d at 1041. If that precept is to be constrained, it is beyond the authority of this Court to do so.

For the foregoing reasons, and on the facts here presented, the mere fact that at the time of the alleged misleading communications the patents-in-suit had not been issued does not stand as a bar to assertion of the defense of equitable estoppel. Accordingly, and because Infineon has demonstrated the existence of triable issues of fact on the equitable estoppel defense, Rambus' motion for summary judgment will be denied.

### CONCLUSION

For the forgoing reasons, the Plaintiff's Motion for Partial Summary Judgment on Defendants' Fifteenth Counterclaim that the Plaintiff's Conduct was "Fraudulent" in Violation of Cal. Bus. & Prof.Code § 17200 (Docket No. 700) is DENIED. Likewise, the Plaintiff's Motion for Summary Judgment on Defendants' Equitable Estoppel Defenses (Docket No. 704) is DENIED.

The Clerk is directed to send a copy of the Memorandum Opinion to all counsel of record.

It is so ORDERED.