Filed 8/30/13  P. v. Stueber CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047330 |
| v. | (Super. Ct. No. 10SF0616) |
| ANDREW J. STUEBER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and postjudgment order of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

Robison D. Harley, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A passenger was killed when the car driven by defendant Andrew J. Stueber crashed into a tree. Defendant had been drinking before the accident. Defendant was convicted of vehicular manslaughter with gross negligence. He raises two arguments on appeal. Finding no merit in either, we affirm the judgment and the postjudgment order.

First, there was sufficient evidence to support a finding that defendant acted with gross negligence. Second, the trial court did not err in awarding restitution to the victim's mother. Both the mother's loss of income and expenses incurred in attending pretrial proceedings were compensable under the relevant statute.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

*Prosecution's Case-in-chief*

On July 31, 2009, defendant, a lance corporal in the United States Marine Corps, attended a "liberty briefing" on base at Camp Pendleton, at which the dangers of drinking and driving were discussed. Later that day, after helping a friend move, defendant and three fellow marines—Kyle Nance, Robert Nichols, and Edmund Vandecasteele—met at Nichols's apartment, located on Avenida Vista Montana in San Clemente. About 9:30 p.m., the four decided to go to a nearby bar, Goody's Tavern; defendant drove the group in his 2003 Ford Mustang GT. Before leaving, the four discussed whether to take a taxi; defendant agreed to be the designated driver.

At Goody's Tavern, the four sat at a table, and ordered one pitcher of beer and one mixed drink. Defendant poured himself a glass of beer from the pitcher. Nance was concerned and told defendant they could take a cab if he wanted to drink; Nichols was also concerned about defendant drinking and then driving. Defendant told them he would be fine, and would stop drinking after that one beer, but they could take a cab if he

2

continued to drink. The four split up, and Nance did not pay much attention to defendant during the rest of the evening. Nichols could not remember whether he saw defendant drink anything other than that first beer.

About 1:30 a.m., the four men met in the tavern's parking lot, then walked to defendant's car. At the car, Nichols and then Nance asked defendant if he was okay to drive, and defendant responded, "yes, I am." Nance had enough money for a cab ride, and both Nichols and Nance had cards provided by the military to receive a free cab ride home after going out drinking. Defendant got into the driver's seat; Vandecasteele was in the front passenger seat, Nichols was seated behind Vandecasteele, and Nance was seated behind defendant. They stopped at a McDonald's restaurant drive-thru before driving toward Nichols's apartment.

The street on which Nichols's apartment was located is a residential street with a steady uphill grade and a 35-mile-per-hour posted speed limit. Defendant drove past the driveway to Nichols's apartment complex. Nichols told defendant he had missed the driveway, and also told defendant to turn up the radio. Defendant continued driving up the street, slowed down a little, and quickly made a U-turn in the middle of the street, causing the car's tires to make a screeching sound. As defendant drove back down the street, he began accelerating; the acceleration pushed Nance "back in [his] seat." Nance yelled at defendant to slow down, but defendant did not respond. Defendant lost control of the car, and overcorrected. The car began shaking and skidding, as defendant grabbed the wheel in an effort to regain control. The car then crossed over into the oncoming traffic lane, and crashed into a tree.

Vandecasteele was pronounced dead at the scene; the cause of death was multiple traumatic injuries. Nance, Nichols, and defendant were knocked unconscious by the collision. All three were injured. Defendant was treated at a local hospital, where his

blood was drawn. Defendant's blood alcohol level was 0.135 percent. A second blood sample drawn about one hour later showed a 0.097 percent blood alcohol level.[1]

About two hours after the accident, a sheriff's deputy arrived at the scene to conduct accident reconstruction testing. The deputy documented the scene, observed tire marks, took measurements, and created a factual diagram. The deputy did not observe any water or wet areas on the street. At the same time, an Orange County crime lab staff member took photographs of the scene. On a later date, a sheriff's deputy conducted skid testing at the accident scene to determine the coefficient of friction on the road. The average coefficient for the three skid tests was 0.687.

Orange County District Attorney's Office Investigator Wesley Vandiver found errors in the investigation and analysis prepared by the sheriff's department, and therefore decided to reassess the scene.

Based on a limited amount of the sheriff's department's work, as well as his own investigation, Vandiver determined the accident occurred in the following way: While driving up the street past Nichols's apartment, defendant drove close to the right curb, then made a very sharp U-turn, causing the tires to squeal. Vandiver calculated defendant's car was travelling between eight and 10 miles per hour while making the U-turn. Coming out of the U-turn, the car began to fishtail because the wheels were turning faster than the forward motion of the car. The car began to slide sideways, but straightened out as defendant countersteered. The car then sped up rapidly, as shown by the acceleration scuffs on the road, which were caused when the tires spun at a rate exceeding the forward acceleration of the car. The car was initially in first gear, and, at some point, defendant shifted into second gear. The acceleration scuffs followed the

---

[1] At trial, a forensic scientist with the Orange County crime lab estimated that a male of defendant's height and weight would have had to consume six or seven standard alcoholic drinks to register that blood alcohol level. The forensic scientist further estimated that, at the time of the accident, defendant's blood alcohol level would have been between 0.12 and 0.13 percent.

4

curve in the road, until they approached the driveway to Nichols's apartment, at which point they deviated to the right side of the road. The car then made left yaw marks, which would have been caused by defendant steering the car hard to the left. The car then accelerated for about 225 feet, before crashing into a tree. Vandiver calculated the maximum rate of speed of the car accelerating down the street was 57.9 miles per hour, with a rate of speed between 27 and 33 miles per hour at the moment of impact.

*Defense Case*

A nearby resident who heard the crash went to the scene of the accident and attempted to aid the injured. This resident testified the road was wet that night; she testified there was so much water in the area that she had to jump over it.

Defendant testified on his own behalf. Defendant testified he did not volunteer to be the designated driver for the group; to the contrary, he was "voluntold" to drive or guilted into it. Defendant admitted drinking a beer after he arrived at Goody's Tavern. He also admitted drinking two shots of whiskey, purchased for him by a man at the bar, between 1:30 and 2:00 a.m. Defendant joined Nichols, Nance, and Vandecasteele in the parking lot after the tavern closed, and they walked to defendant's car. When Nance asked him if he was fine to drive, defendant replied, "yeah, I feel fine. If you don't think I'm fine, we can take a cab or one of you all can drive but I feel good." Nance told defendant he looked good, so they all got in defendant's car. After stopping at a McDonald's restaurant, defendant drove toward Nichols's apartment.

Defendant testified that, as he drove up Avenida Vista Montana, he asked Nichols if there was another entrance to the apartment complex, as the driveway had a large speed bump. Nichols pointed out a second driveway as defendant passed by, but it was too late for him to turn into it. Defendant continued driving uphill for a short distance, then downshifted into first gear and made a U-turn. As defendant was making the turn, someone else "cranked up" the music "[p]retty loud." Someone threw

5

something that struck defendant in the head.  After making a U-turn, defendant accelerated to make up for the extra weight in the vehicle.  Defendant testified he had no further memory of anything that happened that night; his next memory was of being in the hospital.

Defendant testified that on two previous occasions, the gas pedal had stuck to the floor of the car while he was driving, and he had to stomp on the gas pedal to dislodge it.  Defendant's toxicology expert testified, based on defendant's blood alcohol level test results, that his blood alcohol level at the time of the accident would have been between 0.05 and 0.07 percent.  Defendant's accident reconstruction expert criticized several aspects of the sheriff's department's investigation, and aspects of Vandiver's motion analysis.

*Procedural History*

Defendant was charged with vehicular manslaughter with gross negligence while intoxicated.  (Pen. Code, § 191.5, subd. (a).)  (All further statutory references are to the Penal Code.)  A jury found defendant not guilty of that crime, but guilty of the lesser included offense of vehicular manslaughter with gross negligence.  (§ 192, subd. (c)(1).)

The trial court sentenced defendant to the middle term of two years in state prison.  Execution of defendant's sentence was suspended, and he was placed on formal probation for five years.  Defendant was ordered to pay restitution to Vandecasteele's mother in the amount of $80,148.73.  Defendant timely appealed.

DISCUSSION

I.

SUFFICIENCY OF THE EVIDENCE

Defendant argues there was not sufficient evidence to support a finding that he acted with gross negligence, necessitating reversal of his conviction for vehicular

6

manslaughter with gross negligence. "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Gross negligence in the context of a vehicular manslaughter charge is "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*People v. Watson* (1981) 30 Cal.3d 290, 296.) Gross negligence is determined "by applying an *objective* test: if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." (*Ibid.*) "[G]ross negligence may be shown from *all* the relevant circumstances, including the manner in which the defendant operated his vehicle, the level of his intoxication, and any other relevant aspects of his conduct." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1207.)

Defendant quotes from *People v. Ochoa*, *supra*, 6 Cal.4th 1199, in which the court concluded there was sufficient evidence to support a finding of gross negligence, and then compares the facts of this case to those of *People v. Ochoa*. In *People v. Ochoa*, the court held: "The record herein contains facts from which the trier of fact reasonably could infer that defendant, (a) having suffered a prior conviction for driving under the influence of alcohol, (b) having been placed on probation, (c) having attended traffic school, including an alcohol-awareness class, and (d) being fully aware of the risks of such activity, nonetheless (e) drove while highly intoxicated, (f) at high, unsafe and illegal speeds, (g) weaving in and out of adjoining lanes, (h) making abrupt

7

and dangerous lane changes (i) without signaling, and (j) without braking to avoid colliding with his victims' vehicle. [¶] In short, the trier of fact could conclude from defendant's course of conduct and preexisting knowledge of the risks that he exercised so slight a degree of care as to exhibit a conscious indifference or 'I don't care attitude' concerning the ultimate consequences of his actions. Applying the objective test for gross negligence, any reasonable person in defendant's position would have been aware of the risks presented by his conduct." (*Id.* at pp. 1207-1208.)

In the present case, by contrast, defendant contends he had never been convicted of committing, or been placed on probation for, any alcohol-related crimes, and had never attended traffic school or alcohol awareness classes. He argues the warnings about drinking and driving during the liberty briefings were a small part of the briefings, and were delivered in a lighthearted and joking manner. Defendant further contends the jury must have found he was not driving while intoxicated because they found him not guilty of vehicular manslaughter while intoxicated, and there is no evidence he was not following all the traffic laws or that he was driving erratically or unsafely before the accident. He also argues a malfunction with the car and the presence of water on the road—not his gross negligence—caused the car to go out of control.

Considering all relevant circumstances, we conclude there was substantial evidence supporting the conviction for vehicular manslaughter with gross negligence. Despite being advised about the dangers of drinking and driving at weekly liberty briefings, including one on the day of the accident, and having agreed to be the designated driver for the group, defendant had a glass of beer immediately upon entering Goody's Tavern, and had two shots of liquor within an hour before the accident. Even using defendant's toxicology expert's calculations, defendant's blood alcohol level at the time of the accident was between 0.05 and 0.07 percent. While driving down Avenida Vista Montana, which has a steep downhill grade and a posted speed limit of 35 miles per

8

hour, defendant accelerated to a speed that was high enough to cause the car to be ripped in half when it collided with a tree.

Defendant testified he had consciously increased his speed on the downhill portion to compensate for the weight of three additional adult males in the car. Although one witness testified that the road was wet on the night of the accident, all the peace officers who investigated the scene testified the road was dry, and the photographs taken immediately after the accident show no water on the road. Even if the accident was caused by a sticking accelerator pedal,[2] defendant testified the pedal had been a problem two times in the recent past, but he had failed to do anything about it; he claimed the only way to fix the problem, when it occurred, involved putting the car in neutral and stomping on the pedal to dislodge it.

---

[2] At trial, evidence was presented of recall information from the National Highway Traffic Safety Administration, regarding six recall notices issued for the 2003 Ford Mustang GT; none of those recalls was related to a sticking accelerator pedal. With regard to the 2003 Ford Mustang generally, six recall notices had been issued, including one reading, in relevant part: "Vehicle speed control accelerator pedal on certain Mustang Cobra passenger vehicles. The rear surface of the accelerator pedal may come into contact with the floor carpeting during heavy throttle application. The unique surface profile of the accelerator pedal may catch in the cutout on the floor carpeting behind the accelerator pedal. This could interfere with the pedal's ability to return to an idle position. Unexpected continued throttle application and/or increased stopping distances may occur, which could result in a crash." Vandiver testified the Mustang GT and the Mustang Cobra are two different vehicles, so a recall notice for a Mustang Cobra would not necessarily be applicable to a Mustang GT. While there was discussion at trial regarding whether the accelerator pedal on defendant's car might be from a Mustang Cobra, it was undisputed that the sticking accelerator pedal problem, referenced in the recall notices, would only occur when the driver "floor[ed]" it, or when the driver "pushes the pedal down far enough to come into contact with the carpet on the floor." If defendant floored the gas pedal while beginning to accelerate down a residential street with a steep grade, with a posted speed limit of 35 miles per hour, only a short distance from the driveway into which he intended to turn, we would conclude there was sufficient evidence supporting the jury's finding that defendant acted with gross negligence.

II.

*RESTITUTION*

Defendant argues the trial court abused its discretion in awarding restitution to Vandecasteele's mother for her ongoing loss of income because there was no causal connection between his conduct and her inability to work. Defendant further argues the trial court abused its discretion in awarding restitution for the expenses incurred by Vandecasteele's family for attending the conditional exam, the preliminary hearing, and the pretrial hearing because there was no measure of closure gained through their attendance at those pretrial proceedings. We review the court's restitution order for abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 656 (*Giordano*).)

A.

*Factual Background*

The prosecution sought restitution from defendant on behalf of Vandecasteele's mother in the amount of $87,644.61 for economic losses incurred "as a result of th[e] crime related to the following expenses: funeral and burial, death certificates, probate court, postage, attorney's fees, travel to attend court hearings, medical expenses, and loss of income."

The trial court conducted a restitution hearing on September 28, 2012, and ordered defendant to make restitution to Vandecasteele's mother in the amount of $80,148.73. On appeal, defendant does not object to making restitution for certain expenses—funeral and burial costs, death certificates, probate court fees, postage, attorney fees, and medical expenses. Defendant does, however, object to the portions of the order awarding travel expenses incurred by Vandecasteele's mother when she, Vandecasteele's sister, and Vandecasteele's stepfather attended pretrial proceedings, in

10

the total amount of $7,092.74,[3] and awarding to Vandecasteele's mother $43,054.56 for her lost income.

## B.

### *Relevant Law*

Under the California Constitution, "all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. [¶] Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(A), (B).)

The Legislature implemented this constitutional entitlement to restitution by enacting section 1202.4. (*Giordano*, *supra*, 42 Cal.4th at p. 656.) Section 1202.4, subdivision (a)(1) provides, "[i]t is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." In addition, the statute defines "victim" to include both "[t]he immediate surviving family of the actual victim" (§ 1202.4, subd. (k)(1)), and "[a] person who has sustained economic loss as the result of a crime and who . . . [¶] (A) At the time of the crime was the parent, grandparent, sibling, spouse, child, or grandchild of the victim" or "(C) At the time of the crime was a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship listed in subparagraph (A)" (§ 1202.4, subd. (k)(3)(A), (C)).

In line with its stated intent, section 1202.4 provides, "[t]he court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so

---

[3] Vandecasteele's mother "made all of the payments," and Vandecasteele's sister and stepfather did not make any separate restitution requests.

11

and states them on the record" (§ 1202.4, subd. (f)), and requires the restitution order to "be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to," 12 enumerated categories (§ 1202.4, subd. (f)(3)). (The restitution at issue here is not expressly covered by any of the categories in section 1202.4, subdivision (f)(3).)

To effectuate the Legislature's intent in enacting section 1202.4, "'"'loss" must be construed broadly'"' and "[b]ecause the statute uses the language 'including, but not limited to' these enumerated losses, a trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior, even if not specifically enumerated in the statute." (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1046.)[4] The Supreme Court in *Giordano* held, "a surviving spouse may receive as direct restitution the amount of lost economic support incurred due to a criminal act that resulted in the death of his or her spouse," although that type of loss is not specifically enumerated in the statute. (*Giordano*, *supra*, 42 Cal.4th at p. 662.)

In *People v. Crisler* (2008) 165 Cal.App.4th 1503, 1509 (*Crisler*), the court held that the trial court did not abuse its discretion in awarding restitution to the victim's parents for "lost wages and other expenses related to their attendance at defendant's murder trial." The court explained, "the parents were themselves victims of defendant's criminal conduct. They suffered the trauma inherent in the murder of their son" and it was "entirely reasonable that [they] w[ould] attend the murder trial in an attempt to gain some measure of closure and a sense that justice ha[d] been done." (*Ibid.*) Therefore, the parents' lost wages and parking and mileage expenses related to attending the murder

---

[4] In *People v. Keichler*, *supra*, 129 Cal.App.4th at pages 1046-1047, the appellate court affirmed a restitution award for the expenses for a traditional Hmong healing ceremony because the ceremony was the direct result of the defendant having injured the victims in a fight, although such expenses are not among the categories of expenses enumerated in section 1202.4, subdivision (f)(3).

trial "readily qualif[ied] as 'economic loss incurred as the result of the defendant's criminal conduct' since they would not have been incurred had defendant not murdered their son." (*Ibid.*)

The appellate court in *People v. Moore* (2009) 177 Cal.App.4th 1229, 1231-1232 (*Moore*) relied on *Crisler*, in holding the trial court did not abuse its discretion in ordering the defendant, who was convicted of residential burglary, "to pay the victim for the wages he lost while attending the pretrial proceedings and trial" (*Moore*, *supra*, at p. 1231). The court reasoned the language in *Crisler* "conveyed that permitting a crime victim recompense for lost wages while attending trial to gain closure did not impermissibly allow the victim to be opportunistic." (*Moore*, *supra*, at p. 1233.) In addition, the victim's testimony as to the psychological harm that he had suffered as a result of the burglary, and his gratitude to law enforcement officers, the district attorney, and judges at every proceeding, explained "why the victim felt it was necessary to attend all of the trial proceedings." (*Ibid.*) The *Moore* court further noted the *Crisler* decision was not limited "to families of murder victims, to a specific type of proceeding, or to a specific number of hours of court attendance." (*Moore*, *supra*, at p. 1233.) Therefore, "the victim's attendance at the pretrial and trial proceedings, and the costs associated with that attendance, were a direct result of defendant's criminal behavior." (*Ibid.*)

C.

*The Trial Court Did Not Abuse Its Discretion in Awarding Restitution*
*for Vandecasteele's Mother's Ongoing Loss of Income.*

As a threshold matter, Vandecasteele's mother qualifies as a "victim," as defined in section 1202.4, because she is a member of the "immediate surviving family of the actual victim" and also because she "sustained economic loss as the result of a crime and . . . [¶] . . . [a]t the time of the crime was the parent . . . of the victim." (§ 1202.4, subd. (k)(1), (3)(A).) Furthermore, like the parents in *Crisler*, Vandecasteele's mother

13

was herself a victim of defendant's criminal conduct because she endured the pain of losing her son.

Defendant contends the trial court abused its discretion in awarding restitution for Vandecasteele's mother's ongoing loss of income because there was no direct or proximate causal connection between his conduct and her inability to work, and "no genuine medical statement or documentation justifying her inability to work." Most cases address victim restitution in relation to direct causation. (E.g., *Crisler*, *supra*, 165 Cal.App.4th at p. 1509 [affirming the restitution award for the victim's parents' lost wages for time spent at trial because their court attendance was a direct result of the defendant's conduct]; *People v. Baumgart* (1990) 218 Cal.App.3d 1207, 1222-1224 [affirming the restitution award because although the defendant did not carry out the fraudulent scheme, he solicited victims' investments causing their losses].) Only two published cases have discussed proximate causation in the context of victim restitution. (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320-1325 (*Holmberg*); *People v. Jones* (2010) 187 Cal.App.4th 418, 424-427 (*Jones*).)

In *Jones*, *supra*, 187 Cal.App.4th at page 427, the restitution sought for damage to the victim's car bumper, which had occurred while she was parking at the courthouse for a hearing in the defendant's case, raised an issue of proximate causation. The victim's "conduct in driving the bumper of her car over the concrete curb" was potentially an independent intervening cause that could relieve the defendant of liability. (*Ibid.*) However, the court did not resolve the issue because it found an abuse of discretion by the trial court on other grounds. (*Ibid.*)

On the other hand, the court in *Holmberg*, *supra*, 195 Cal.App.4th at pages 1320-1324, did resolve a proximate causation issue. The defendant argued that although he possessed the stolen property, he could not be ordered to pay restitution to the property owners because their losses were caused by burglaries that he was not charged with committing, and not by his possession of the stolen property. (*Id.* at

14

pp. 1315, 1322.)  In affirming the restitution award, the appellate court reasoned, "there can be more than one cause of injury and that multiple causes can combine to cause harm." (*Id.* at p. 1322.)  The court concluded that because the defendant obtained the property the day it was stolen and did not contact law enforcement, despite the fact he knew the property was stolen, his "conduct played far more than a negligible or theoretical part in bringing about the victims' injuries and was a substantial factor in causing the harm they suffered." (*Ibid.*)

Here, the evidence supports the conclusion that defendant's conduct was a direct and proximate cause of Vandecasteele's mother's inability to work.  The Attorney General argues Vandecasteele's mother "had been unable to work due to the emotional impact of the crime.  She was receiving disability pay, losing approximately $1,196.33 of salary per month.  Additionally, she was advised by her doctor that she was unable to return to work full time."  At the restitution hearing, the trial court noted there was a letter from the mother's doctor, "indicating she ha[d] been under his care and on medication . . . due to the death of her son," as well as "documentation from an employer that she had a job and the job paid her a certain amount.  [¶] There is a letter from the disability provider that she was collecting disability."  The court concluded, "it stands to reason without the court engaging in any kind of irrational or undue speculation that that insurance policy did not pay out without a sufficient examination of her condition," and, given "the broad mandate that the court has upon it to grant restitution where it is reasonably related, and there is a reasonable basis for the court to order it, . . . I will order, then, income loss to Mrs. Vandecasteele for $43,054.56."

Unlike *Jones*, there was no evidence presented here of an independent intervening cause that could relieve defendant of liability for restitution.  Furthermore, similar to the defendant's conduct in *Holmberg*, defendant's conduct was a substantial factor in causing Vandecasteele's mother's inability to work because of the emotional impact his conduct had on her, as evidenced by the doctor's letter and the disability

15

benefits she was receiving. Therefore, the trial court did not err in finding there was a causal connection between defendant's conduct and Vandecasteele's mother's loss of income.

## D.

*The Trial Court Did Not Abuse Its Discretion in Awarding Restitution
for Expenses Incurred in Attending Pretrial Proceedings.*

The trial court did not abuse its discretion in awarding restitution for expenses Vandecasteele's mother incurred for her and her family's attendance at pretrial proceedings. Defendant argues the attendance of Vandecasteele's mother, sister, and stepfather at the pretrial proceedings provided "no sense of justice" and, therefore, the expenses should not be reimbursed.

First, the trial court did not abuse its discretion in awarding restitution to Vandecasteele's mother for expenses incurred by Vandecasteele's sister and stepfather. Like the mother, the sister qualifies as a victim under section 1202.4 because she is a member of the "immediate surviving family of the actual victim" and also because she "sustained economic loss as the result of a crime and . . . [¶] . . . [a]t the time of the crime was the . . . sibling . . . of the victim." (§ 1202.4, subd. (k)(1), (3)(A).)

As for Vandecasteele's stepfather, case law has not addressed whether a stepparent is considered immediate family for purposes of section 1202.4; the statute itself does not define "immediate surviving family" (§ 1202.4, subd. (k)(1)). However, at the restitution hearing, the trial court found the stepfather came "within the purview of the code section dealing with immediate family and as a parent." At the hearing, the prosecutor explained she "believe[d] [the stepfather] stepped into the shoes of the father" because "the biological father was abusive and became a non-existent part of the family for a very long time." The prosecutor further explained, "there were several years that he was the stepfather," and he was the stepfather at the time of Vandecasteele's death.

16

Based on that information, it was reasonable for the court to conclude the stepfather qualified as a victim under section 1202.4, subdivision (k)(1) or (3)(A).

Even if "immediate surviving family" does not include stepparents, Vandecasteele's stepfather would qualify as a victim under section 1202.4, subdivision (k)(3)(C), which defines "victim" to include "[a] person who has sustained economic loss as the result of a crime and who . . . [¶] . . . [¶] . . . [a]t the time of the crime was a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship" between parent and child. Because the sister and stepfather would be entitled to recover their losses directly as victims, it was proper for the trial court to include their expenses as part of the restitution to Vandecasteele's mother where she incurred the expenses on behalf of Vandecasteele's sister and stepfather.

Second, the trial court did not abuse its discretion in awarding restitution for expenses incurred in attending the conditional exam, the preliminary hearing, and the pretrial hearing, despite the fact each was a pretrial proceeding. A victim's attendance at pretrial proceedings, and the costs associated with such attendance, are just as much a direct result of a defendant's conduct as is attendance at and associated costs of trial. (See *Moore*, *supra*, 177 Cal.App.4th at p. 1233; *Crisler*, *supra*, 165 Cal.App.4th at p. 1509.) Here, Vandecasteele's mother, sister, and stepfather would not have attended pretrial proceedings but for defendant's conduct. In addition, just as the lingering psychological effects of the burglary in *Moore* explained the victim's compulsion to attend all pretrial and trial proceedings, the psychological impact of losing a son and brother explain why Vandecasteele's family felt a need to attend the pretrial proceedings at issue here. Furthermore, Vandecasteele's family did not attend every pretrial proceeding; they only attended proceedings where "evidence was presented or sentencing was at issue." Therefore, it was not an abuse of discretion by the trial court to award restitution for the expenses incurred in attending the three pretrial proceedings. This

17

conclusion is in line with case law and the legislative intent of section 1202.4, which permits broad entitlement to restitution.

The judgment and postjudgment order are affirmed.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


THOMPSON, J.